**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ORACIO CORRALES-VAZQUEZ,
*Defendant-Appellant.*

No. 18-50206

D.C. No.
3:18-mj-03051-GPC-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted June 12, 2019
Pasadena, California

Filed July 24, 2019

Before: Ferdinand F. Fernandez, Kim McLane Wardlaw,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Concurrence by Judge Bybee;
Dissent by Judge Fernandez

## SUMMARY[*]

### Criminal Law

The panel reversed a misdemeanor conviction for eluding examination or inspection by immigration officers in violation of 18 U.S.C. § 1325(a)(2).

The panel held that an alien who crosses into the country at a non-designated time or place is not guilty under § 1325(a)(2). Rather, to convict a defendant under § 1325(a)(2), the government must prove that the alien's criminal conduct occurred at a time and place designated for "examination or inspection by immigration officers"—i.e., at a port of entry open for inspection. Because the government failed to make that showing, the panel reversed the conviction.

Concurring, Judge Bybee wrote separately to note his sympathy for the government's position, considering the difficulty caused by the court's jurisprudence regarding § 1325(a)(1), which makes it a crime for an alien to enter the United States outside an open port of entry.

Dissenting, Judge Fernandez wrote that he would affirm because the elements of § 1325(a)(2) are that the accused was an alien and that he knowingly eluded examination or inspection by an immigration officer, and there is no requirement that the accused either eluded inspection at a port

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of entry, or, at least, eluded inspection by an immigration officer at the moment he entered the United States.

**COUNSEL**

Doug Keller (argued), Federal Defenders of San Diego Inc., San Diego, California, for Defendant-Appellant.

D. Benjamin Holley (argued), Assistant United States Attorney; Helen H. Hong, Chief, Appellate Division; Robert S. Brewer Jr., United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**OPINION**

BYBEE, Circuit Judge:

Federal law makes it a crime for "[a]ny alien" to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers," 8 U.S.C. § 1325(a)(1), or to "elude[] examination or inspection by immigration officers," *id.* § 1325(a)(2). In this case, we consider whether an alien who crosses into the country at a non-designated time or place is guilty of "elud[ing] examination or inspection by immigration officers" under § 1325(a)(2). We hold that the answer is no. To convict a defendant under § 1325(a)(2), the government must prove that the alien's criminal conduct occurred at a time and place designated for "examination or inspection by immigration officers"—i.e., at a port of entry that is open for inspection.

Because the government failed to make that showing in this case, we reverse.

I

Oracio Corrales-Vazquez is a native and citizen of Mexico who does not have authorization to enter the United States. In June 2018, he crossed into the United States from Mexico approximately 20 miles east of the port of entry at Tecate, California. Several hours after Corrales crossed into the country, a border patrol officer found him along with three other individuals hiding in some brush approximately four miles north of the international border. Corrales admitted to the officer that he was not authorized to be in the United States. He was arrested and charged with "elud[ing] examination or inspection by immigration officers," in violation of 8 U.S.C. § 1325(a)(2).

The district court held a bench trial, during which Corrales argued that an alien eludes examination or inspection under § 1325(a)(2) only by crossing into the country at a port of entry, a fact that the government failed to prove in his case.[1] If an alien could violate § 1325(a)(2) by simply crossing into the United States without examination or inspection, Corrales argued, then § 1325(a)(1)—which specifically prohibits entering or attempting to enter the United States at a non-designated time or place—"would be superfluous."

---

[1] Notably, Corrales did not dispute in the district court that an alien who enters the United States between ports of entry without authorization would violate § 1325(a)(1). Corrales was charged, however, with violating only § 1325(a)(2).

The district court disagreed with Corrales's interpretation of § 1325(a)(2), concluding that an alien "eludes examination or inspection" by crossing into the United States "without submitting to" an examination or inspection.   After determining that Corrales crossed into the United States without undergoing an examination or inspection, the court found Corrales guilty of violating § 1325(a)(2) and sentenced him to time served.  He now appeals his conviction.

## II

On appeal, Corrales renews his argument that the government failed to adduce sufficient evidence to prove that he "elude[d] examination or inspection by immigration officers" in violation of § 1325(a)(2).  "We review challenges to the sufficiency of evidence, including questions of statutory interpretation, de novo."  *United States v. Aldana*, 878 F.3d 877, 880 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 157 (2018).

## III

Section 1325(a) provides in full:

> Any alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offense, be fined under Title 18 or imprisoned

> not more than 6 months, or both, and, for a
> subsequent commission of any such offense,
> be fined under Title 18, or imprisoned not
> more than 2 years, or both.

Congress first enacted a version of this provision in 1952 as part of the Immigration and Nationality Act (INA), Pub. L. No. 82-414, § 275, 66 Stat. 163, 229.  But its origins date back much farther.  Beginning in the early twentieth century, our immigration laws required deportation for certain aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection."  Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889.[2]  In 1929, Congress decided that aliens who "enter the United States surreptitiously" should be subject to not only deportation but also criminal penalties, H.R. Rep. No. 70-2418, at 7–8 (1929), and revised the prohibitions in the 1917 statute to be "broad enough to cover entry in any manner," *id.* at 4.  The new criminal statute thus made it a misdemeanor for any alien to "enter[] the United States at any time or place other than as designated by immigration officials or elude[] examination or inspection by immigration officials, or obtain[] entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact."  Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551, 1551 (codified at 8 U.S.C. § 180a (Supp. III 1929)).  Congress replicated the 1929

---

[2] *See also* Act of Mar. 3, 1891, ch. 551, § 8, 26 Stat. 1084, 1085–86 (criminalizing the act of "knowingly or negligently land[ing] or permit[ting] to land any alien immigrant at any place or time other than that designated by the inspection officers"); Act of Mar. 3, 1903, ch. 1012, § 18, 32 Stat. 1213, 1217–18 (same); Act of Feb. 20, 1907, ch. 1134, § 18, 34 Stat. 898, 904 (same).

statute's three substantive prohibitions with minimal alteration in 1952 in the INA, and in 1990 added liability for "attempt[ing] to enter" under § 1325(a)(1) and § 1325(a)(3). *See* Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(2), 104 Stat. 4978, 5059.

We are concerned here with what it means for an alien to "elude[] examination or inspection by immigration officers" under § 1325(a)(2).[3]  In the government's view, any alien who crosses into the United States without examination or inspection necessarily "eludes examination or inspection," even if the alien crosses miles away from any place where those processes occur.  Corrales, by contrast, contends that the conduct criminalized by § 1325(a)(2) can occur only at places and times designated for examination or inspection by immigration officers.  Taking into account the statutory text and context, we reject the government's reading of § 1325(a)(2) and hold that the crime of "elud[ing] examination or inspection by immigration officers" can be committed only where and when examinations or inspections take place—at open ports of entry.

## A

"We begin, as usual, with the statutory text."  *Maslenjak v. United States*, 137 S. Ct. 1918, 1924 (2017).  And because the relevant phrase—"eludes examination or inspection by immigration officers," 8 U.S.C. § 1325(a)(2)—"has remained unchanged" since it was first used in 1929, it "presumptively

---

[3] The term "examination" in this provision refers to medical examinations, *see* 8 U.S.C. § 1222(b), while "inspection" refers to background screening, searches, and other prerequisites for admission, *see id.* § 1225(a)(3), (d).

retains its original meaning," *Whitfield v. United States*, 135 S. Ct. 785, 788 (2015).

The processes referenced in § 1325(a)(2)—"examination or inspection by immigration officers"—occur, as they always have, at "designated ports of entry" that are "staffed by immigration officials" and "open for inspection." *Aldana*, 878 F.3d at 882 (citing 8 C.F.R. § 235.1(a)); *see Ngim Ah Oy v. Haff*, 112 F.2d 607, 608 (9th Cir. 1940); *Kaneda v. United States*, 278 F. 694, 696–97 (9th Cir. 1922).[4]  And as a literal matter, entering the United States without examination or inspection, regardless of where or how, could be described as "elud[ing]" those processes if, as the government urges, the word "elude" is defined broadly to mean "evade compliance with or fulfilment of" an obligation, 3 *Oxford English Dictionary* 97 (1st ed. 1933) ("*OED First*").    Several

---

[4] To be sure, under the INA, an immigration inspection can technically occur anywhere along the border and at any time, because any alien "who arrives in the United States"—"whether or not at a designated port of arrival"—is "deemed . . . an applicant for admission," 8 U.S.C. § 1225(a)(1), and all "applicants for admission . . . shall be inspected by immigration officers," *id.* § 1225(a)(3).  This means that the border patrol agent who discovered Corrales technically performed an "inspection" at the time he was found.  But we have interpreted "[t]he language in [§ 1325(a)(2)]" to refer to the "immigration procedures conducted . . . at the time of entry, a fixed point in time." *United States v. Rincon-Jimenez*, 595 F.2d 1192, 1193 (9th Cir. 1979); *see also* 8 C.F.R. § 235.1(a) ("Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection . . . .").  As a result, inspections occurring *after* that fixed point in time would not fall within the "inspection" contemplated in § 1325(a)(2).  Indeed, were it otherwise, then no alien who is ultimately found and inspected by an immigration officer—even hours or perhaps days after the alien crossed into the United States—could be said to have "elude[d]" inspection. *See United States v. Oscar*, 496 F.2d 492, 494 (9th Cir. 1974).

considerations, however, lead us to reject that expansive interpretation.

To begin with, not every "word in a statute . . . extend[s] to the outer limits of its definitional possibilities," and the government's interpretation of the word "eludes" "sits uncomfortably with common usage." *Abuelhawa v. United States*, 556 U.S. 816, 820 (2009) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)). In 1929, as today, the verb "elude" was more commonly used to mean "avoid slyly, by artifice, stratagem, or dexterity," or "escape from in a covert manner." *Webster's New International Dictionary* 713 (1st ed. 1930); *see also, e.g.*, *Concise Oxford Dictionary of Current English* 368 (2d ed. 1929) ("[e]scape adroitly from"); 3 *OED First* 97 ("escape by dexterity or stratagem," or "slip away from, escape adroitly from"); *Webster's New Collegiate Dictionary* 267 (6th ed. 1951) ("avoid adroitly, as by artifice; evade," or "escape the notice of"); *Webster's New World College Dictionary* 455 (2d ed. 1970) ("avoid or escape from by quickness, cunning, etc.," or "escape detection, notice, or understanding by"); *Webster's Third New International Dictionary* 738 (2002) ("avoid slyly or adroitly," or "escape the notice or perception of"). To "elude" something would not usually mean to simply avoid it—the avoidance generally contemplates some form of "escape," whether through "quickness [or] cunning[ness]." *United States v. Oscar*, 496 F.2d 492, 494 (9th Cir. 1974) (citation omitted).[5] For example, "in the case of five seamen

---

[5] Indeed, had Congress wanted to use a broader verb such as "avoid," it easily could have done so, as it did in other immigration-related statutes. *See, e.g.*, 18 U.S.C. § 139 (1926) (repealed 1940) (imposing criminal penalties on any admitted citizen who "knowingly den[ies] that he has been so admitted, with the intent *to evade or avoid* any duty or liability

who were not produced for inspection upon arrival" of a ship, one might say that the men "managed to *elude* the guards stationed in and about the vessel" by escaping the ship without the guards' detection. *The Tuscania*, 42 F.2d 168, 169 (2d Cir. 1930) (emphasis added). But it would have been quite odd to say that the men "eluded" the guards if the men had avoided the port altogether and instead traveled by airplane. To elude, in other words, generally contemplates a risk of exposure to, and subsequent escape from, the object being eluded. Applying that narrower definition here, an alien "eludes examination or inspection" only if the alien's conduct occurs at a time and place where the alien is at risk of undergoing those processes in the first place. Because those processes occur at open and operating ports of entry, the alien's criminal conduct—the "elud[ing]"—must occur there as well. This would include, for example, an alien who hides in the trunk of a vehicle passing through a port of entry, or an alien who crosses through a port of entry on foot and then sneaks by the officers conducting inspections or examinations. But it would not include an alien who crosses the border miles away from any place where those processes occur.

More importantly, even if the government's broader interpretation of the phrase "eludes examination or inspection" might be plausible in isolation, "statutes are not

imposed or required by law" (emphasis added)). Or Congress could have replicated the language already in use in the predecessor to § 1325(a), which prohibited "enter[ing] without inspection." 39 Stat. at 889. Congress's decision not to use either of these "ready alternative[s]" in § 1325(a)(2) "indicates that Congress did not in fact want" this particular provision of the statute to be as broad as the government claims. *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (citing *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014)).

read as a collection of isolated phrases." *Abuelhawa*, 556 U.S. at 819. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)). And in this case, "statutory context compels a more circumscribed reading." *McDonnell v. United States*, 136 S. Ct. 2355, 2367 (2016).

When § 1325(a) is read as a whole, the "overall statutory scheme," *Sturgeon*, 136 S. Ct. at 1070 (citation omitted)—and § 1325(a)(2)'s place within it—becomes evident. As described above, § 1325(a)(2) follows § 1325(a)(1), which separately makes it a crime to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers." And § 1325(a)(2) precedes § 1325(a)(3), which makes it a crime to enter or attempt to enter the United States "by a willfully false or misleading representation or the willful concealment of a material fact." Considered together, these three provisions—which carry identical criminal penalties—are "broad enough to cover entry in any manner." H.R. Rep. No. 70-2418, at 4. Section 1325(a)(1) covers aliens who enter or attempt to enter outside of an open port of entry. *See Aldana*, 878 F.3d at 882. Section 1325(a)(2) covers aliens who cross through an open port of entry, but elude examination or inspection in doing so. And § 1325(a)(3) covers aliens who cross through an open port of entry and submit to examination and inspection, but obtain entry (or attempt to obtain entry) through willful misrepresentation or concealment. The statute works as a seamless whole.

The government's reading of the statute disrupts its careful structure. If, as the government argues, merely crossing into the United States without examination or inspection violates § 1325(a)(2), regardless of time or place, then much of the highly specific language in § 1325(a)(1) would be superfluous—any alien who "enters . . . the United States at any [non-designated] time or place" under § 1325(a)(1) would also be guilty of "elud[ing] examination or inspection" under § 1325(a)(2). The government's interpretation thus violates "the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)); *see Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal alteration omitted) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))).[6]

Indeed, if § 1325(a)(2) is as broad as the government says it is, then at the time of § 1325(a)'s enactment—before "attempt[]" was added in 1990, *see* 104 Stat. at 5059—§ 1325(a)(1) would have been not only superfluous but subsumed *entirely* within § 1325(a)(2). In other words,

---

[6] The dissent argues that we should not "consider the canon that seeks to avoid redundancy" because, in its view, § 1325(a)(2) "is not truly ambiguous." Dissent at 27. But as the Supreme Court has explained in rejecting this precise argument, ignoring "the antisuperfluousness canon" merely "because 'there is nothing ambiguous about the language'" of a particular provision in isolation "violates 'the cardinal rule that a statute is to be read as a whole.'" *Corley*, 556 U.S. at 314 n.5 (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991)).

every violation of § 1325(a)(1) for entering at a non-designated time or place would have also been a violation of § 1325(a)(2) for eluding examination or inspection.  The government's interpretation therefore also runs afoul of the related principle of interpretation "that 'general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment.'"  *Bloate v. United States*, 559 U.S. 196, 207–08 (2010) (internal alteration omitted) (quoting *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932)); *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012) (explaining how the "general/specific canon" acts with the anti-surplusage canon to avoid "the superfluity of a specific provision that is swallowed by [a] general one").

Although neither of these interpretive principles establishes "an absolute rule," they do provide "a strong indication of statutory meaning," especially when, as here, "the two [provisions] are interrelated and closely positioned, both in fact being parts of the same statutory scheme." *RadLAX*, 566 U.S. at 645–46 (internal alteration omitted) (quoting *HCSC–Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam)).  For example, in *Maslenjak*, the Supreme Court rejected an interpretation of a provision making it a crime to "procure[], contrary to law, naturalization" that would have swept in any person who "obtain[s] citizenship without the requisite legal qualifications." 137 S. Ct. at 1925 & n.2 (quoting 18 U.S.C. § 1425(a)).  The Court observed that such an expansive interpretation, although perhaps "plausible" in isolation, would have rendered "superfluous" the "highly specific language" in an adjoining provision that made it a crime "to 'procure or obtain naturalization' for '[one]self or another

person not entitled thereto.'" *Id.* at 1925 n.2 (alteration in original) (quoting 18 U.S.C. § 1425(b)). "Rather than reading those words to do no work, in violation of ordinary canons of statutory construction," the Court understood "Congress to have defined two separate crimes." *Id.* Similar examples abound. *See, e.g.*, *Marinello v. United States*, 138 S. Ct. 1101, 1106–07 (2018) (rejecting the government's "literal" interpretation of a felony obstruction provision in the Internal Revenue Code in part because it would have "render[ed] superfluous" the "numerous misdemeanors" in the Code that "specifically" dealt with willful violations of certain tax requirements (citation omitted)); *United States v. Chase*, 135 U.S. 255, 260 (1890) (declining to interpret the noun "writing" in a criminal statute to include mailed letters in light of the "separate and distinct clause" in the statute "specifically" dealing with letters); *United States v. Cabaccang*, 332 F.3d 622, 627 (9th Cir. 2003) (en banc) (rejecting the government's interpretation of 21 U.S.C. § 952(a) under which "any conduct proscribed by the first clause of § 952(a) also would have been covered by the statute's broader second clause when § 952 was enacted in 1970, rendering the first clause of the statute superfluous").

These basic interpretive principles control this case. The government concedes that, under its broad interpretation of § 1325(a)(2), there is no set of facts that would have been criminal under § 1325(a)(1) but not under § 1325(a)(2) at the time of the statute's enactment—any alien who entered at a non-designated time or place in violation of § 1325(a)(1) would have also eluded examination or inspection in violation of § 1325(a)(2). Because § 1325(a)(1) "specifically deal[s] with" entry at a non-designated time or place, the broader language in § 1325(a)(2) should "not be held to apply to" that

same conduct. *RadLAX*, 566 U.S. at 646 (quoting *D. Ginsberg & Sons*, 285 U.S. at 208).

To be sure, § 1325(a)(1) now criminalizes "attempts to enter," while § 1325(a)(2) does not expressly mention "attempt." So § 1325(a)(1), as it exists today, may not be totally subsumed within § 1325(a)(2). But "attempt" was not added to § 1325(a)(1) until 1990, *see* 104 Stat. at 5059, and "later laws that 'do not seek to clarify an earlier enacted general term' and 'do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute,' are 'beside the point' in reading the first enactment." *Gutierrez v. Ada*, 528 U.S. 250, 257–58 (2000) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998)); *cf. New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("It's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary meaning at the time Congress enacted the statute.'" (citation and internal alterations omitted)). And as the Supreme Court has explained, the 1990 amendments to the INA—and this section of the amendments in particular—were not "intended to change, or to clarify, the fundamental relationship" between the INA's substantive provisions. *Almendarez-Torres*, 523 U.S. at 233–34. The 1990 amendments to § 1325(a)(1) did not expand the scope of conduct prohibited by § 1325(a)(2).

In any event, even under the statute as it exists today, the government's interpretation still runs afoul of "the presumption 'that statutory language is not superfluous,'" *McDonnell*, 136 S. Ct. at 2369 (citation omitted), because the actual entry offense in § 1325(a)(1) would serve no role in the statute—every alien who "enters . . . the United States at any [non-designated] time or place" under § 1325(a)(1) would

also "elude[] examination or inspection" under § 1325(a)(2). Rather than reading the "highly specific language" in § 1325(a)(1) "to do no work, in violation of ordinary canons of statutory construction, we understand Congress to have defined two separate crimes" in § 1325(a)(1) and (2). *Maslenjak*, 137 S. Ct. at 1925 n.2.

Confirming our understanding is the fact that § 1325(a)(1) and § 1325(a)(2) are connected by the word "or," a term that is "almost always disjunctive, that is, the words it connects are to be given separate meanings." *Loughrin*, 573 U.S. at 357 (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). The disjunctive connector further demonstrates that § 1325(a)(1) and § 1325(a)(2) prohibit different conduct. Yet the government would have us read § 1325(a)(2) to prohibit much of the same conduct already prohibited by § 1325(a)(1). Construing § 1325(a)(1) as "a mere subset of" § 1325(a)(2), as the government urges, "disregard[s] what 'or' customarily means" and "effectively reads 'or' to mean 'including'—a definition foreign to any dictionary we know of." *Id.*[7]

---

[7] The government raises a superfluity problem of its own, asserting that even under a narrower reading of § 1325(a)(2), the statute would still overlap with 19 U.S.C. § 1459, which imposes criminal penalties on "individuals arriving in the United States" who intentionally fail to "enter . . . at a border crossing point" or fail to "present themselves . . . for inspection." 19 U.S.C. § 1459(a), (g). We are unpersuaded. Section 1459 is located in the title of the U.S. Code dealing with customs, so it says little about the scope of § 1325(a)(2), which is in a separate title dealing with immigration. Indeed, § 1459 applies to all "individuals," not just "aliens." And in any event, overlap "is not uncommon in criminal statutes." *Loughrin*, 573 U.S. at 358 n.4. What is uncommon, however, is reading one specific criminal provision to be subsumed by an adjoining one.

Finally, a narrower interpretation of § 1325(a)(2) comports with the genesis of the phrase "eludes examination or inspection." The statutory predecessor to § 1325(a)(2) broadly prohibited "enter[ing] without inspection." 39 Stat. at 889. When Congress undertook to redraft the statute, it adopted language, including the verb "eludes," from then-extant Canadian law. *See Proposed Deportation Legislation: Hearing Before the H. Comm. on Immigration & Naturalization*, 68th Cong. 8–9 (1924) (statement of Rep. Watkins) ("They use that term in Canada, where I got that language. . . . This section was taken from the Canadian law and it handles the situation satisfactorily, and our people up there want the same thing."). And the Canadian law upon which § 1325(a)(2) was modeled imposed criminal penalties on "[a]ny person . . . who *at a port of entry* eludes examination by an officer." *Restriction of Immigration: Hearings on H.R. 5, H.R. 101, and H.R. 561 Before the H. Comm. on Immigration & Naturalization*, 68th Cong. 680 (1924) (emphasis added); *see* Immigration Act, 1910, 9 & 10 Edw. 7 c. 27, § 33(7) (Eng.), *reprinted in* R.S.C. 1927, c. 93 (Can.).**[8]** The criminal act of "elud[ing] examination by an

_____

**[8]** The operative Canadian law largely mirrors the prohibitions contained in § 1325(a):

> Any person who enters Canada except at a port of entry, or who at a port of entry eludes examination by an officer, or Board of Inquiry, or who enters Canada by force or misrepresentation or stealth or otherwise contrary to any provision of this Act, or who escapes from custody of an officer or from an immigrant station when detained for any cause under this Act, shall be guilty of an offence under this Act . . . .

Immigration Act, 1910, 9 & 10 Edw. 7 c. 27, § 33(7) (Eng.), *reprinted in* R.S.C. 1927, c. 93 (Can.).

officer" was therefore understood at the time to occur "at a port of entry," where examinations took place.

Ultimately, the government's reading of § 1325(a)(2) renders much of the remainder of § 1325(a) inoperative for no apparent reason. Rather than believing that Congress drafted such a strange statutory scheme, we instead ascribe to § 1325(a)(2) a narrower meaning, one that "make[s] sense rather than nonsense out of the *corpus juris*." *Maslenjak*, 137 S. Ct. at 1926 (citation omitted). Together, § 1325(a)(1) and § 1325(a)(2) make it a crime to enter the United States without submitting to examination or inspection. But the two provisions operate separately based on the manner of entry. Section 1325(a)(1) covers conduct occurring at any time or place other than "a designated port of entry when it is open for inspection." *Aldana*, 878 F.3d at 882. Section 1325(a)(2), we now hold, covers the rest—conduct occurring at a designated port of entry that is open for inspection, where "examination [and] inspection by immigration officers" take place.

## B

The government advances two additional arguments to support its broad interpretation of § 1325(a)(2). Neither is persuasive.

First, the government asserts that its interpretation is supported by our decision in *United States v. Rincon-Jimenez*, 595 F.2d 1192 (9th Cir. 1979). Not so. In *Rincon-Jimenez*, "[t]he sole issue on appeal" was whether § 1325(a)(2) is "a continuing offense which tolls the statute of limitations so long as [the defendant] remains present" in the United States. *Id.* at 1193. We answered that question in the negative. *Id.*

"Because the[] examinations and inspections" referenced in § 1325(a)(2) "are to take place at the time of entry, a fixed point in time," we held that the limitations period begins to run "as of the time of the illegal entry." *Id.* at 1193–94.

*Rincon-Jimenez* did not purport to address the manner of entry necessary to violate § 1325(a)(2). To be sure, the defendant in that case "entered the United States . . . by traversing the beach between Tijuana and San Ysidro late at night," and we remarked that "the offense described by § [1325(a)(2)] is consummated at the time an alien gains entry *through an unlawful point* and does not submit to [the required] examinations." *Id.* (emphasis added). But the defendant did not challenge the sufficiency of the evidence supporting his conviction, nor did we consider that question. "[C]ases are not precedential for propositions not considered," *United States v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018), or for "questions which 'merely lurk in the record,'" *United States v. Shabani*, 513 U.S. 10, 16 (1994) (citation and internal alteration omitted).

Second, the government points out that § 1325(a)(1) uses the word "enters," while § 1325(a)(2) does not. The term "entry" under the immigration laws "is a term of art requiring not only physical presence in the United States but also freedom from official restraint." *United States v. Argueta-Rosales*, 819 F.3d 1149, 1158 (9th Cir. 2016). The government contends that § 1325(a)(2) "does not include 'enter' and is thus free from the additional doctrines that term brings." The dissent raises a similar point. *See* Dissent at 28.

Far from supporting the government's interpretation, however, this argument only highlights the problem with it. As we have explained, the government's interpretation of

§ 1325(a)(2) renders the entry offense in § 1325(a)(1) superfluous, because there is no scenario in which an alien could "enter[] . . . the United States" at a non-designated time or place under § 1325(a)(1) without also "elud[ing] examination or inspection" under § 1325(a)(2). If, as the government suggests, § 1325(a)(2) does not require proof of "entry,"[9] then the superfluity created by the government's interpretation would have a significant impact—the government would simply charge all aliens who illegally cross into the United States under § 1325(a)(2), thereby eliminating entirely the doctrinal requirements accompanying the word "enters" in § 1325(a)(1). This only confirms that the government's reading of § 1325(a)(2) is not the best one. *Cf. Fowler v. United States*, 563 U.S. 668, 677 (2011) (noting a "particular reluctance to 'treat statutory terms' as 'surplusage' 'when the words describe an element of a criminal offense'" (quoting *Ratzlaf v. United States*, 510 U.S. 135, 140–41 (1994))).

## IV

We hold that to "elude[] examination or inspection by immigration officers" in violation of § 1325(a)(2), the alien's conduct must occur at a designated port of entry that is open for inspection and examination. We need not decide precisely what conduct at an open port of entry would constitute "elud[ing] examination or inspection," as the government concedes in this case that Corrales crossed into the United States "far from a port of entry." Accordingly, Corrales's conviction for violating § 1325(a)(2) is **REVERSED**.

---

[9] We have not previously considered whether this proposition is correct, and we need not and do not do so here.

BYBEE, Circuit Judge, concurring:

I write separately to note my sympathy for the government's position in this case.  For the reasons given in the opinion for the court, the government's reading of 8 U.S.C. § 1325(a)(2) is wrong.  But I understand its impulse to try to charge illegal entry under § 1325(a)(2) rather than under § 1325(a)(1).  As I have previously explained, much of our illegal-entry and illegal-reentry jurisprudence is a mess.  *See United States v. Argueta-Rosales*, 819 F.3d 1149, 1162–71 (9th Cir. 2016) (Bybee, J., concurring in the judgment and dissenting as to everything else).

The challenge for the government is that we have made § 1325(a)(1)—which makes it a crime for an alien to enter or attempt to enter the United States outside an open port of entry—increasingly difficult to enforce.  There are two problems.  The first problem stems largely from our understanding of the official restraint doctrine, which "has reached an absurd position."  *Id.* at 1162.  To prove that an alien has "entered" the United States, the government must prove not only that the alien crossed into the United States, but also that the alien was at some point "free from official restraint."  *Id.*  We consider an alien under "official restraint" so long as government surveillance cameras capture the alien crossing into the country, or a border patrol agent who observed the crossing through binoculars is able to maintain continuous observation of the alien while pursuing him or her.  This has led us to "some very strange 'how-many-angels-are-dancing-on-the-head-of-a-pin' inquiries."  *See id.* at 1165–67 (discussing *United States v. Pacheco-Medina*, 212 F.3d 1162  (9th Cir. 2000), and its progeny).

The second problem is that to prove that an alien "*attempted* illegal entry or reentry," the government must prove that the alien had "the specific intent to reenter 'free from official restraint'" by "*any* government official." *Id.* at 1168–69 (quoting *United States v. Lombera-Valdovinos*, 429 F.3d 927, 929 (9th Cir. 2005)). Under this rule, an alien who "crosses into the United States surreptitiously and outside a port of entry," but who never achieves freedom from official restraint, cannot be convicted of attempted illegal entry or reentry as long as the alien "tells border control that he came in hopes of remaining under restraint by *any* government official—even in a federal prison far from the border—once in the United States." *Id.* at 1162. We have overturned at least two convictions where the aliens, who were captured in the act of crossing the border outside a port of entry, told border officials that they were entering the country in the hopes of being incarcerated. Since the aliens wished *not* to be free of official restraint, the government couldn't prove that they intended to be free of official restraint. *See id.* at 1158 (reversing and remanding for a new trial where the trier of fact might have concluded that the alien was delusional and seeking protection when he climbed the 10-foot primary fence); *Lombera-Valdovinos*, 429 F.3d at 928–29 (reversing the conviction where the alien crossed the primary fence and told the official he wished to go to jail). As I pointed out in *Argueta-Rosales*, this "has left our law stuck in a catch-22 worthy of Joseph Heller: Aliens who cross the border hoping to enter the United States free of restraint must be restrained, while aliens who cross hoping to be restrained by the United States must be freed. Under [this] regime, no one gets what he wants, but some people go to jail, while everyone else goes home." 819 F.3d at 1171.

In light of this doctrinal minefield, I suspect that the government is charging aliens who would otherwise be charged with entering at a non-designated time or place under § 1325(a)(1) with eluding inspection under § 1325(a)(2), which (according to the government) does not suffer from the infirmities of our "official restraint" and "specific intent to enter free from official restraint" law. Today we require the government to march in a straight line when it charges violations of § 1325(a). But we should also clean up our own mess under § 1325(a)(1) at the first opportunity.

---

FERNANDEZ, Circuit Judge, dissenting:

As the majority points out, Corrales argues that his conviction should be reversed because the evidence was insufficient to convict him of the misdemeanor of "elud[ing] examination or inspection by immigration officers." 8 U.S.C. § 1325(a)(2).[1]

The district court determined that the elements of the crime spelled out in § 1325(a)(2) were: (1) the accused was an alien, and (2) the accused knowingly eluded examination or inspection[2] by immigration officers. It then held that the evidence proved beyond a reasonable doubt that Corrales had committed that offense. Corrales asserts that the district court erred because, as he sees it, the government was required to

---

[1] Hereafter, unless otherwise indicated, section numbers refer to sections of Title 8 of the United States Code.

[2] Hereafter, I will use the word "inspection" to refer to both inspection or examination.

prove that he either eluded inspection at a port of entry,[3] or at least, eluded inspection "by an immigration officer at the moment he entered the United States." In that respect, he insists that in order to "elude," the alien must have snuck through a port of entry, or if the alien entered the country elsewhere, "snuck by" an officer who was on the scene at the moment of entry. Because there was no evidence of those elements, he argues, his conviction cannot stand. My colleagues agree; I do not.

In interpreting statutes "[t]he starting point of [the] inquiry is the language of the statute itself." *United States v. Cabaccang*, 332 F.3d 622, 625 (9th Cir. 2003) (en banc). In so doing, we use canons of construction. Those canons:

> help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete."

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S. Ct. 1146, 1149 117 L. Ed. 2d 391 (1992) (internal citations omitted). When I apply those canons and rules here, it is immediately apparent to me that the simple words of § 1325(a)(2) will not bear Corrales' attempt to insert the

---

[3] *See United States v. Aldana*, 878 F.3d 877, 880, 882 (9th Cir. 2017) cert. denied, __ U.S.__, 139 S. Ct. 157, 202 L. Ed. 2d 96 (2018).

limiting phrase "at a port of entry."  Nothing in the enactment allows us to add that language to that statute's wording.  In fact, if that limitation were intended, Congress would have included it just as it had included "at any time or place other than as designated by immigration officers" in § 1325(a)(1). *Cf. Nken v. Holder*, 556 U.S. 418, 430, 129 S. Ct. 1749, 1759, 173 L. Ed. 2d 550 (2009).  It did not do so.[4]

Corrales' other attempt to restrict the reach of § 1325(a)(2) has more purchase, but also fails.  He argues that "elude" requires that the alien must cunningly or slyly slip or creep by (as he puts it, sneak by) an opponent.  But, as I see it, all the language means is that the alien has avoided or evaded those who would address him or his presence.  I do agree that an alien who seeks to illegally cross the borders of the United States will often show some initiative,

---

[4] The majority seeks to support its position by pointing to Congress' knowledge of an earlier Canadian statute that provided: "Any person . . . who at a port of entry eludes examination by an officer, or Board of Inquiry, . . . shall be guilty of an offence . . . ."  Immigration Act, 1910, 9 & 10 Edw. 7 c. 27, § 33(7) (Eng.), *reprinted in* R.S.C. 1927, c. 93 (Can.); *see also Restriction of Immigration: Hearings Before the H. Comm. on Immigration & Naturalization on H.R. 5, H.R. 101, and H.R. 561,* 68th Cong. 680 (1924) (text of Canadian statute); *Proposed Deportation Legislation: Hearings Before the H. Comm. on Immigration & Naturalization*, 68th Cong. 8–9 (1925) (statement of Rep. Elton Watkins, Member, H. Comm. on Immigration & Naturalization, regarding origin of language).  But that knowledge points in the other direction.  Congress ultimately adopted much of the Canadian provision's language, including the word "eludes."  *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551, 1551.  However, Congress omitted the phrase "at a port of entry"—essentially the very phrase that the majority now inserts, even though Congress has never seen fit to return the phrase to the statutory scheme.

resourcefulness,[5] desire to evade,[6] and even some degree of what can be seen as slyness or cunning,[7] in an attempt to enter unnoticed.[8]  In fact, if an alien desires to cross the United States border without being stopped or detected by barriers (natural or otherwise), or technological devices, or our alert immigration and border patrol officers, some of the characteristics captured by the word "elude" will be in that person's makeup and plans.  But that just emphasizes the good sense of Congress when it used that expansive word; it does not indicate that any of those possibilities restricts the meaning of the statutory language or makes it ambiguous. Put otherwise, it simply means that the alien's characteristics and plans have enabled him to cross into the United States illegally and without inspection, despite all of this country's efforts to prevent that eventuality.  As we have said, "[b]ecause these examinations and inspections are to take place at the time of entry, a fixed point in time, this suggests that the offense described by § 1325(2) is consummated at the

---

[5] *See Encarta World English Dictionary* 582 (1999) ("to escape from or avoid somebody or something by cunning, skill, or resourcefulness").

[6] *See* 1 *The Compact Edition of the Oxford English Dictionary* 847 (1st ed. 1971) ("[t]o evade compliance with or fulfilment of (a law, order, demand, request, obligation, etc.)"); 3 *The Oxford English Dictionary* 97 (1933) (same); 3 *A New English Dictionary on Historical Principles* pt. I at 97 (James A. H. Murray & Henry Bradley eds., Oxford, The Clarendon Press 1891) (same).

[7] *See United States v. Oscar*, 496 F.2d 492, 494 (9th Cir. 1974).  In the situation at hand, the aliens in question were clever enough to wrap blankets around their feet to conceal their tracks.

[8] *See Webster's Third New International Dictionary* 738 (Philip Babcock Gove ed., 1986) ("to escape the notice or perception of"); *see also Webster's New Collegiate Dictionary* 267 (2d ed. 1951).

time an alien gains entry through an unlawful point and does not submit to these examinations." *United States v. Rincon-Jimenez*, 595 F.2d 1192, 1193–94 (9th Cir. 1979). In short, Corrales' attempt to restrict the reach of § 1325(a)(2)'s language does not persuade me.

But, says Corrales, if we do not restrict § 1325(a)(2) as he desires, the result will be that we have rendered § 1325(a)(1) redundant and surplus. That is so, he insists, because if an alien could be convicted under § 1325(a)(2) for crossing the border at a place which is not a designated port of entry or a place where no government officer is close at hand, any prosecution under § 1325(a)(1) would necessarily be encompassed by § 1325(a)(2), which would make the § 1325(a)(1) language surplusage. That argument is interesting, but in my view it is not sufficient to earn Corrales the obsidional crown.

As I have already noted, if the statutory language is not truly ambiguous, that ends the matter and we need not go on to consider the canon that seeks to avoid redundancy. *See Conn. Nat'l Bank*, 503 U.S. at 253–54, 112 S. Ct. at 1149. Moreover, even if there is redundancy, I am not gallied by that fact. It is not as if redundancy across statutes is a rarity. *See id*. at 253, 112 S. Ct. at 1149; *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385, 133 S. Ct. 1166, 1177, 185 L. Ed. 2d 242 (2013). I do recognize that it is unusual to find redundancy within a single statutory section,[9] but even then I see no basis for engaging in judicial legislation to artificially force a restriction onto a statute that its language does not encompass. Furthermore, it is probable that

---

[9] *See Marinello v. United States*, __ U.S. __, __, 138 S. Ct. 1101, 1107, 200 L. Ed. 2d 356 (2018).

Congress acted with caution because it was attempting to repair existing immigration laws which fostered "[i]nequities, gaps, loopholes, and lax practices [that had] become apparent through the years." H.R. Rep. No. 82-1365, at 27 (1952). "In any event, our hesitancy to construe statutes to render language superfluous does not require us to avoid surplusage at all costs." *United States v. Atl. Research Corp.*, 551 U.S. 128, 137, 127 S. Ct. 2331, 2337, 168 L. Ed. 2d 28 (2007). In this particular area, Congress would have seen[10] the need for caution because, for example, the seemingly plain word "enters" that appears in § 1325(a)(1) could take on somewhat arcane legal meanings.[11] As it turns out, those legal meanings have created some complications and exceptions in a statutory regime which is intended to impose penal sanctions upon those who illegally cross the borders of this country.[12] That would explain Congress' use of statutory language that, if somewhat redundant, is not actually surplusage in a pejorative sense. We can assume that Congress sought to assure relatively complete coverage of the illegal border-crossing problem, despite the unforeseen vagaries and

---

[10] *See Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S. Ct. 866, 870, 55 L. Ed. 2d 40 (1978).

[11] *See Ex parte Chow Chok*, 161 F. 627, 630–31 (C.C.N.D.N.Y.), *aff'd sub nom. Chow Chok v. United States*, 163 F. 1021 (2d Cir. 1908) (mem.) (per curiam); *see also Kaplan v. Tod*, 267 U.S. 228, 230–31, 45 S. Ct. 257, 257–58, 69 L. Ed. 585 (1925).

[12] *See, e.g.*, *United States v. Vazquez-Hernandez*, 849 F.3d 1219, 1228 (9th Cir. 2017); *United States v. Argueta-Rosales*, 819 F.3d 1149, 1158–59 (9th Cir. 2016); *United States v. Cruz-Escoto*, 476 F.3d 1081, 1085–86 (9th Cir. 2007); *United States v. Lombera-Valdovinos*, 429 F.3d 927, 929–30 (9th Cir. 2005); *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1218–19 (9th Cir. 2001); *United States v. Pacheco-Medina*, 212 F.3d 1162, 1164 (9th Cir. 2000).

vicissitudes of changing legal and physical conditions in border protection and in methods of evading that protection. In other words, canons of interpretation are meant to help us carry out congressional purposes, not to obstruct those purposes. By the way, without undue effort one can think of situations where an alien's illegal crossing of our borders can fall into one or the other of the provisions, but Congress did not need to depend on the strength or weakness of the interpretive prowess of one court or another. If § 1325(a)(1) and § 1325(a)(2) amount to a form of overkill, so be it; they are what Congress provided.

Thus, again, I would reject Corrales' assertion that more evidence was required to convict him under § 1325(a)(2). Instead, I would affirm, despite Corrales' earnest, if Daedalian, argument that he has discovered some newly hatched elements of § 1325(a)(2). In my opinion, those hatchlings are not actually elements of the offense at all. They did not have to be proved beyond a reasonable doubt in order to convict Corrales. Therefore, I respectfully dissent.