NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

NOV 1 2023

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-50276 |
| Plaintiff-Appellee, | D.C. No. |
| v. | 3:20-mj-20169-JLB-AJB-1 |
| JHOANTAN VILMAR BERNAL-SANCHEZ, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted August 15, 2023
Pasadena, California

Before: WARDLAW, CHRISTEN, and SUNG, Circuit Judges.
Partial Concurrence and Partial Dissent by Judge CHRISTEN.

Jhoantan Bernal-Sanchez appeals the district court's denial of his appeal

from his misdemeanor conviction for attempted illegal entry under 8 U.S.C.

§ 1325, following a bench trial before a magistrate judge. We have jurisdiction

under 28 U.S.C. § 1291, and we conditionally vacate and remand.

---

[*] This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

1. The magistrate judge abused its discretion by denying discovery under *Brady v. Maryland*, 373 U.S. 83 (1963) as to Agent Monroy's "I'm 10-15" Facebook activity, and the district court erred by affirming without ordering that the magistrate judge examine the material *in camera* to determine whether there was any prejudice. To succeed on a *Brady* claim, Bernal-Sanchez must show that: "(1) the evidence at issue was favorable to him, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) that he was prejudiced." *United States v. Bruce*, 984 F.3d 884, 894–95 (9th Cir. 2021).

The magistrate judge concluded that the requested information was immaterial and undiscoverable, without requiring the government to review the information or provide it for *in camera* review. Although it is undisputed that the government possessed information about the 10,000 open investigations, it is also undisputed that the government did not search for or produce Agent Monroy's "I'm 10-15" activity and simply relied on the fact that no disciplinary action related to the Facebook group was in his personnel file. The government and the magistrate judge also erroneously relied upon Agent Monroy's representation that he did not participate in the group. Nothing in the record establishes that the investigations into all Border Patrol agents' Facebook group activities had been completed or that all "I'm 10-15" disciplinary actions had been recorded in each

agent's files. Further, due to the racist, violent, and degrading nature of the comments on the "I'm 10-15" group pages and because Agent Monroy denied posting, liking, or commenting on the group, *any* activity by Agent Monroy would have impeached Monroy's statement that he had not contributed to the group pages. *See Davis v. Alaska*, 415 U.S. 308, 316 (1974). However, it is now impossible for us to determine whether the potential discovery undermines our confidence in the outcome or shows a reasonable probability of a different result. *See United States v. Doe*, 705 F.3d 1134, 1152–53 (9th Cir. 2013). The government's argument that Agent Krawcion's testimony alone was sufficient to prove the elements of Bernal-Sanchez's conviction is unavailing, given that the government did call Agent Monroy to testify, and the magistrate judge relied on some of that testimony in its findings.

Under these circumstances, we follow the procedures set forth by the Supreme Court in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), and "vacate the defendant's conviction and remand to the district court" for an *in camera* review of any Agent Monroy "I'm 10-15" materials in the government's possession to determine whether the Facebook "I'm 10-15" pages "contain probative, relevant, and material information" that "could have affected the outcome of the trial." *United States v. Alvarez*, 358 F.3d 1194, 1209 (9th Cir. 2004). If the pages contain material information, the district court shall "release the appropriate information to

3

the defense and order a new trial," but if the district court "determines that a new trial is not warranted, the court shall reinstate the judgment of conviction." *Id.*; *see also Doe*, 705 F.3d at 1152.

2. The district court also erred by affirming the admission of employment documents secured through the government's misuse of a Rule 17(a) subpoena. Fed. R. Crim. P. 17(a) sets forth the procedure for the issuance of subpoenas commanding attendance and testimony at court proceedings. By contrast, Fed. R. Crim. P. 17(c) governs the production of documents and objects "in court before trial or before they are to be offered in evidence." But the court must approve the issuance of a Rule 17(c) subpoena and, upon motion, the court may quash or modify such subpoena.

Here, the government obtained a subpoena pursuant to Rule 17(a) that commanded the custodian of records for Bernal-Sanchez's employer, 20/20 Plumbing & Heating, to appear at his trial with documents to be produced at that proceeding. The specific documents sought were listed on Attachment A. The items listed on Attachment A were all of Bernal-Sanchez's employment records for the past six years and eight months. And Attachment A informed the employer that it could "provide the information by e-mail" directly to the U.S. Attorney's office. However, when the agents served the subpoena, they simply collected hard copies of the subpoenaed records at that time.

The government thus transformed a Rule 17(a) subpoena into a Rule 17(c) subpoena without the court's approval and thereby deprived Bernal-Sanchez of his right to move to quash or modify the patently overbroad subpoena under Rule 17(c)(2). Therefore, the government obtained these records in violation of Fed. R. Crim. P. 17. This conduct also violated the district's local rule, S.D. Cal. Crim. R. 17.1(b), which expressly prohibits parties in a criminal case from using a subpoena to require production of documents at a date or time other than the proceedings at which the documents will be introduced, "unless the Court has entered an order under Rule 17(c). . . authorizing the issuance of such subpoena." The local rules further require service of a Rule 17(c) subpoena on all parties who may want to object "at least seventy-two hours (72) prior to the return date."

The government abused its subpoena power, misled 20/20 Plumbing & Heating about its obligations, and then used these documents to threaten Bernal-Sanchez with impeachment and potential additional charges, should he decide to testify. The district court should have reversed the magistrate judge's denial of Bernal-Sanchez's subsequent motion to quash.

Typically, we must assess whether such error "materially affect[ed] the verdict," *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005). However, because we are remanding this case to the district court to consider the materiality and potential prejudice of the "I'm 10-15" materials, we also instruct

the district court to consider in the first instance whether admission of the improperly subpoenaed materials, either alone or in combination with the omission of the "I'm 10-15" materials, prejudiced Bernal-Sanchez.

In the future, the government should strictly comply with Rule 17 and the district's local rules when seeking pretrial discovery in a criminal case.

3.  The district court did not err in declining to unseal the government's sealed applications for an order regarding disclosure or non-disclosure.  Two of the applications pertain to individuals who did not ultimately testify at trial, and thus the government had no obligation to produce their personnel files.  *United States v. Henthorn*, 931 F.2d 29, 31 (9th Cir. 1991).  The third application contains information the government had already disclosed to Bernal-Sanchez.  Therefore, allowing the government's applications to remain under seal did not prejudice Bernal-Sanchez.

4.  Bernal-Sanchez's argument that § 1325 violates the equal protection clause is foreclosed by *United States v. Carrillo-Lopez*, 68 F.4th 1133 (9th Cir. 2023).

The district court is **AFFIRMED IN PART** and **REVERSED IN PART.** Bernal-Sanchez's conviction is conditionally **VACATED** and **REMANDED** for further proceedings not inconsistent with this memorandum.

6

*USA v. Jhoantan Bernal-Sanchez*, No. 21-50276

CHRISTEN, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's conclusion that the district court erred by failing to require further discovery of Agent Monroy's activities in the "I'm 10-15" Facebook group, and also agree that the court erred by admitting records the Government improperly obtained via a Rule 17(a) subpoena. But because neither error prejudiced Bernal-Sanchez and the evidence of his guilt was overwhelming, I respectfully dissent from the court's decision to conditionally vacate Bernal-Sanchez's conviction and remand.

The undisputed factual circumstances surrounding Bernal-Sanchez's arrest are dispositive of the materiality and prejudice inquiries, so I begin with a detailed explanation of the circumstances under which he was arrested.

On January 17, 2020, at approximately 3:00 a.m., a Marine Corps scope operator patrolling the United States/Mexico border near the Tecate Port of Entry spotted two people standing near the border fence. He announced on the Border Patrol's radio channel that he had sighted two people, then radioed again to report that they were running away. Agents Monroy and Krawcion were both on patrol that night. They heard the scope operator's broadcast and began searching for two people. Agent Monroy told Agent Krawcion that he believed the two were in a fenced lot approximately one tenth of a mile from the border. Agent Krawcion

1

later testified that he entered the lot and found Bernal-Sanchez and another man lying on the ground in tall weeds, face up and breathing hard. Krawcion questioned why Bernal-Sanchez was there, and Bernal-Sanchez replied that he had just been kicked "by three guys." This response was curious because the area was deserted at 3:00 a.m. Agent Krawcion again asked why Bernal-Sanchez was there, and Bernal-Sanchez said he did not know. Agent Krawcion posed a series of questions to Bernal-Sanchez about his immigration status, and Bernal-Sanchez answered that he was a Mexican citizen without legal status to enter the United States. He produced an employment authorization card but it said "Not valid for reentry into the U.S."

Agent Krawcion next spoke to Bernal-Sanchez's companion, also found lying on the ground, and he admitted that he had jumped over the fence with Bernal-Sanchez. In Agent Krawcion's written report and subsequent trial testimony, he recounted that Bernal-Sanchez heard his companion's response and interjected, "No, I didn't. I didn't jump the fence. I'm just going to work." Agent Krawcion asked how Bernal-Sanchez would get to work "at 3:00 in the morning, in a closed-off city," and Bernal-Sanchez replied that he had a truck in the lot. But Bernal-Sanchez was unable to identify a truck that belonged to him, or to identify what lot the truck was in, and he had no car keys. Agent Krawcion arrested both men and then inspected the area. He discovered a rope tied to a tree on the Mexico

2

side of the border, dangling over the fence and into the United States. Agent Krawcion also testified that he observed two sets of footprints on either side of the border fence leading to and from the rope.

The Government charged Bernal-Sanchez with attempted illegal entry, a violation of 8 U.S.C. § 1325(a)(1). This statute prohibits a person without lawful status from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers." In his testimony at Bernal-Sanchez's bench trial, Agent Krawcion described how and where Bernal-Sanchez and his companion were arrested, that no businesses in the area were open at 3:00 a.m., and that the Tecate Port of Entry did not open until 5:00 a.m. The Government also introduced an application that Bernal-Sanchez had filled out in March 2020 "under penalty of perjury" to renew his employment authorization. On it, Bernal-Sanchez admitted that he had last arrived in the United States on January 17, 2020, the date Agent Krawcion arrested him.

Sneaking through an open port of entry is a violation of 8 U.S.C. § 1325(a)(2). This offense can be committed, for example, by a person secreted in the trunk of a car passing through a port of entry. *United States v. Corrales-Vazquez*, 931 F.3d 944, 949 (9th Cir. 2019). The offense that Bernal-Sanchez was charged with violating, § 1325(a)(1), criminalizes entering the country outside official ports of entry. *See id.* at 950, 954 (holding that to be

3

convicted under § 1325(a)(2) "the alien's conduct must occur *at a designated port of entry that is open for inspection and examination*," while to be convicted under § 1325(a)(1) the alien must "enter or attempt to enter *outside of an open port of entry*" (emphasis added)).

At trial, the defense did not deny that Bernal-Sanchez had crossed the border—nor could it, given Bernal-Sanchez's admission on the work authorization form that he had last entered the United States on January 17, 2020. The defense was effectively limited to arguing that there was reasonable doubt that Bernal-Sanchez might have passed through the port of entry without being detected on January 17, 2020, that he did so sometime between midnight and 3:00 a.m., and that because the Government did not show when the Tecate port closed, it could have been open when Bernal-Sanchez passed through it.

The trial court judge considered the evidence and both parties' arguments. Acknowledging the strong evidence that Bernal-Sanchez and his companion jumped the fence, and likely recognizing that the defense theory would have required the port to be open between midnight and 2:59 a.m., but not open between 3:00 a.m. and 5:00 a.m., the trial court issued a detailed oral ruling that Bernal-Sanchez was guilty of violating 8 U.S.C. § 1325(a)(1).

## I.    *Brady* Information

Bernal-Sanchez first argues that the Government violated the discovery obligations imposed by *Brady* because it failed to search pages saved from "I'm 10-15," a now-inactive Facebook group that was formerly used by some Border Patrol agents. Bernal-Sanchez argues the Government was obligated to look for evidence that Agent Monroy authored or responded to racist messages posted on the Facebook page because if such evidence existed, it could have been used to impeach Agent Monroy's testimony.

The government is required to produce to the defense "evidence favorable to an accused," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that is "known to . . . others acting on the government's behalf," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That said, the government violates *Brady* only when it fails to produce such evidence that is "material." *Bailey v. Rae*, 339 F.3d 1107, 1113 (9th Cir. 2003). "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012). "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

The court ordered the Government to disclose that Agent Monroy had been a member of the "I'm 10-15" Facebook group for several years, but did not require

5

the Government to search the saved Facebook records for activity by Agent Monroy. I agree with my colleagues that the court erred by declining to order the Government to search for evidence of Agent Monroy's participation in the group. *United States v. Bruce*, 984 F.3d 884, 895–98 (9th Cir. 2021) (discussing government's burden of disclosing potentially exculpatory evidence that could support defense theory). I do not agree that it is impossible to determine whether the potential evidence undermines our confidence in the outcome of Bernal-Sanchez's trial, or that there is a reasonable probability that the result of the trial would have differed.

No part of the Government's case against Bernal-Sanchez depended on Agent Monroy's testimony. *See Strickler*, 527 U.S. at 291 (holding that there must be a reasonable probability of a different result after "a total, or just a substantial, discount" of the impeached witness's testimony). Agent Krawcion testified that "we heard one of the Marine Corps scope operators put out a call that he saw two individuals standing next to the fence, and then they were running away." Agent Krawcion also testified that, moments later, he found Bernal-Sanchez and another man lying in tall grass in the lot. Agent Krawcion recounted Bernal-Sanchez's explanations for his presence in the lot—which did not make sense—and described for the trial court that he found a rope still dangling over the border fence and two sets of footprints leading from it. It was Agent Krawcion, not Agent Monroy, who

6

questioned the two men and testified to Bernal-Sanchez's companion's admission that they had just climbed over the fence. In short, Agent Monroy's testimony was not needed to establish any of the elements of the charged offense. The Government's other evidence amply supported the court's judgment.

The cases the majority relies upon do not support Bernal-Sanchez's argument that remand is warranted. In *Doe*, the defendant planned to argue that the FBI either entrapped him or sanctioned his activities as a confidential informant. *United States v. Doe*, 705 F.3d 1134, 1150 (9th Cir. 2013). Given that defense theory, we held that the government violated *Brady* by failing to produce records showing the defendant's contacts with and provision of information to the FBI because the withheld evidence "would undoubtedly have been helpful to his defense." *Id.* at 1151. And in *Muniz-Jaquez*, undisclosed audiotapes could have been "crucial" to cross-examine the government's only witness who might have observed the defendant crossing the border. *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1184 (9th Cir. 2013). Bernal-Sanchez's case is not comparable to these cases because Agent Monroy was not the sole eyewitness, or even a necessary witness, at Bernal-Sanchez's trial. Because Agent Krawcion's testimony independently proved each element of the Government's case, evidence impeaching Agent Monroy's credibility would not have changed the outcome of

Bernal-Sanchez's bench trial. The failure to produce *non-material* impeachment evidence does not require remand. *See Strickler*, 527 U.S. at 296.

## II. Subpoena Error

I agree that the Government misused Federal Rule of Civil Procedure 17(a) to obtain Bernal-Sanchez's employment records. The Government later introduced the records, which noted that Bernal-Sanchez was not working between January 5 and February 3 due to his mother's death, to show that Bernal-Sanchez was not working on the day of his arrest, and that he lied when he told Border Patrol that he was on his way to work.

When evidence is erroneously admitted, the benefitted party must show it is "more probable than not that the [trier of fact] would have reached the same verdict" even if the evidence had not been admitted. *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005). The risk that a judge's verdict in a bench trial will be "affected unfairly and substantially by the admission of [improper] evidence is far less than in a jury trial." *See EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994). Here, the Government easily met its burden to show that the introduction of Bernal-Sanchez's employment records would not have affected the outcome of the trial.

The trial court referred to the employment records only once in its oral ruling, noting that the records, together with Bernal-Sanchez's inconsistent

8

statements to Agent Krawcion and Bernal-Sanchez's inability to produce car keys, proved that he falsely told Border Patrol that he was near the border with his truck on January 17th because he was on the way to work.[1]  The issue at trial was not whether Bernal-Sanchez was working near the border.  He was charged with violating 8 U.S.C. § 1325(a)(1), and to prove that crime, the Government was required to show that Bernal-Sanchez lacked lawful immigration status and that he had entered the United States outside of a designated port of entry.  *United States v. Aldana*, 878 F.3d 877, 882 (9th Cir. 2017).  The Government's evidence resoundingly established Bernal-Sanchez's guilt.

Bernal-Sanchez admitted on his employment authorization application that he had entered the United States on January 17, 2020.  This concession left the defense to argue at trial that Bernal-Sanchez had somehow passed unnoticed through the Tecate Port of Entry sometime after midnight on the 17th, and that he had remained hidden in the lot near the border until he was found at 3:00 a.m.  Accepting this theory would have required the trial court to overlook compelling circumstantial evidence that Bernal-Sanchez had entered exactly as his companion had admitted: by using the rope that officers found hanging over the border fence.

---

[1] The district court found no prejudice because it mistakenly understood that the representative from Bernal-Sanchez's employer had brought all the subpoenaed employment records with her to trial.  The trial court was aware that the representative did not bring all previously produced documents to trial.

Unsurprisingly, the court concluded that the Government had proved its case. In doing so, the trial court specified that it reached this conclusion "even without reference to" "the portion of the documentation from the employment records that indicates that the defendant was [absent from work] due to his mom's passing." We have said that when a court expressly states that improper evidence did not affect its decision, it is probable that the error was harmless. *See Farmer Bros.*, 31 F.3d at 898. Here, given the trial court's explicit statement that it relied on other evidence, remand is not warranted.

The Government compounded its erroneous use of Rule 17(a) and disregard of Local Criminal Rule 17.1(b) by warning Bernal-Sanchez that if he testified, the Government would impeach him for an allegedly misleading statement he made to the court in connection with an earlier request to continue the trial date. The stated need for the continuance was refuted by the employment records the Government obtained with the Rule 17(a) subpoena. To avoid undue delay, the court disallowed this impeachment evidence. Bernal-Sanchez nevertheless argues that he was prejudiced by this excluded evidence because the Government's stated intent to impeach him with the employment records dissuaded him from testifying. In light of the admission Bernal-Sanchez made on the application to renew his employment authorization, I can see no realistic likelihood that this is so. Had Bernal-Sanchez testified, he would have been confronted with the statement he

10

made under penalty of perjury on that application: that he last entered the United States on January 17, 2020.  At that point, the Government would have been free to ask how he had entered the country on that date, which would have required Bernal-Sanchez to admit to the charged offense (that he had entered outside a port of entry), or to admit to another offense (that he had entered uninspected through a port of entry), or to invoke his Fifth Amendment privilege.  On this record, the Government's misuse of Rule 17(a) and disregard of Local Criminal Rule 17.1(b) neither interfered with Bernal-Sanchez's decision to testify nor affected the verdict.

The majority correctly calls out the Government's failure to satisfy its *Brady* discovery obligation and disregard for Local Criminal Rule 17.1(b).  Neither error warrants remand given the compelling evidence of Bernal-Sanchez's guilt.  I therefore join the majority's conclusion that the Government failed to meet its discovery obligations under *Brady* and misused Rule 17(a).  I also join the majority's disposition of the challenge to the Government's sealed applications for orders regarding disclosure, and agree that Bernal-Sanchez's equal protection argument lacks merit.  But because I disagree with the majority's *Brady* materiality analysis and its decision to remand the prejudice analysis of the improperly subpoenaed employment records, I respectfully dissent from the decision to conditionally vacate Bernal-Sanchez's conviction.

11