**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DAVID G. BRUCE II, AKA David G. Bruce,
*Defendant-Appellant.*

No. 19-10289

D.C. No.
1:17-cr-00077-DAD-BAM-1

OPINION

Appeal from the United States District Court
for the Eastern District of California
Dale A. Drozd, District Judge, Presiding

Argued and Submitted August 14, 2020
San Francisco, California

Filed January 12, 2021

Before: Michael Daly Hawkins and Morgan Christen,
Circuit Judges, and James E. Gritzner,[*] District Judge.

Opinion by Judge Christen

---

[*] The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's orders admitting identification evidence and denying a motion for new trial in a case in which David Bruce was convicted of conspiracy, attempt to possess with intent to distribute heroin or marijuana, and bribery, arising from Bruce's involvement in a drug smuggling scheme at the United States Penitentiary at Atwater, California, where Bruce worked as a correctional officer.

The panel held that the district court reasonably concluded that the use of a Facebook photo during an identification procedure was not so suggestive that it rendered the witness's identification unreliable.

The panel held that the district court did not err by denying the motion for new trial in which Bruce argued that the government violated *Brady v. Maryland* by failing to produce evidence indicating that Atwater officer Paul Hayes was a target of an investigation into a very similar smuggling ring at a different federal prison, that numerous inmate complaints had been made against Hayes prior to the Bruce investigation, and that Hayes pressured some inmates to offer evidence against Bruce. The panel held that the evidence was exculpatory within the meaning of *Brady* and at the very least the government was required to investigate it. Addressing *Brady*'s materiality requirement, the panel cited the weight

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and force of the evidence against Bruce, and concluded that its confidence in the verdict was not undermined by the government's failure to disclose the exculpatory evidence.

**COUNSEL**

Amanda K. Moran (argued) and Janay D. Kinder, Moran Law Firm, Fresno, California, for Defendant-Appellant.

Vincenza Rabenn (argued), Assistant United States Attorney; Camil A. Skipper, Appellate Chief; McGregor W. Scott, United States Attorney; United States Attorney's Office, Sacramento, California; for Plaintiff-Appellee.

**OPINION**

CHRISTEN, Circuit Judge:

David Bruce appeals his convictions for conspiracy, 18 U.S.C. § 371, Attempt to Possess with Intent to Distribute Heroin or Marijuana, 21 U.S.C. §§ 846, 841(a)(1), and Bribery: Public Official Accepting a Bribe, 18 U.S.C. § 201(b)(2)(C). The charges arose from Bruce's involvement in a drug smuggling scheme at the United States Penitentiary at Atwater, California, where Bruce worked as a correctional officer. After a jury trial, Bruce was convicted and sentenced to 78 months in prison.

Bruce raises two issues on appeal. First, he argues the district court erred by admitting testimony from another participant in the smuggling scheme who identified Bruce from a Facebook photo. We conclude the district court did

not abuse its discretion by admitting the government's identification evidence. Second, Bruce argues he is entitled to a new trial because the government violated the discovery obligations imposed by *Brady v. Maryland*, 373 U.S. 83 (1963). In particular, Bruce argues the government violated his right to due process because it failed to disclose evidence of another prison guard's alleged malfeasance. We agree with Bruce that at least some of the withheld evidence was exculpatory, but conclude it was not material within the meaning of *Brady*. The district court did not err by denying Bruce's motion for a new trial.

I.

On December 12, 2015, Thomas and Tracy Jones were on their way to visit an inmate at the United States Penitentiary in Atwater, California (Atwater), when guards conducting random car searches stopped them at a checkpoint. As the officers began their search, Jones admitted there were drugs in the car he was driving. The officers found four vacuum-packed bags of marijuana, a package of heroin, and three marijuana cigarettes.

Jones agreed to cooperate after investigators suggested that if he did not do so, he and his wife could face a lengthy incarceration, and he spoke to the investigators at length. Jones told the investigators that he and his wife had developed an online relationship with an inmate named Devonne Randolph over the course of the preceding year, and that they began visiting Randolph at Atwater. After Jones and his wife agreed to receive packages and cash for Randolph, packages containing money and "little medicated strips" began to arrive at their home. Jones also reported receiving transfers of cash from people associated with other

Atwater inmates, and he told the officers that Randolph gave him a telephone number to send text messages to someone he referred to as "Officer Johnson" when packages arrived. According to Jones, Randolph said that Officer Johnson would deliver the packages to Randolph in prison. Jones admitted making a delivery to Officer Johnson in September 2015, and another in November. Both deliveries took place in a parking lot near Atwater. Jones recounted entering Officer Johnson's black Jeep Cherokee, handing him the packages, and leaving.

When asked to describe Officer Johnson, Jones said Johnson was "Hispanic looking" with dark curly hair. Jones also described Officer Johnson wearing a Pittsburgh Steelers hat and having a raspy voice, a heavyset build, and dark skin. One of the officers recalled seeing another correctional officer sporting a Steelers hat at an off-duty event. He showed Jones a Facebook photo from the event that included David Bruce and one other person. Bruce was the only one in the photo wearing a Steelers hat. Without hesitation, Jones identified Bruce as Officer Johnson.

In the days following the checkpoint interview, Jones assisted Atwater agents in setting up an additional meeting. An agent went to the parking lot as Jones had done before and sent a text message announcing his arrival. Within a few minutes, Bruce appeared driving one of two cars he owned. Though there was "[p]lenty of parking available," Bruce circled the parking lot twice and slowed down each time he passed Jones's car. The agents stopped Bruce, who denied being there for a drug deal but surrendered his telephone for a forensic examination. Approximately fifteen months later, in March 2017, Bruce was arrested and indicted for

conspiracy, attempted possession with intent to distribute heroin or marijuana, and accepting a bribe as a public officer.

As Bruce's case proceeded toward trial, the government filed an ex parte motion for in camera review. The motion sought permission to not disclose certain information about two Atwater officers, including Officer Paul Hayes. The motion informed the district court that Hayes was present during the initial search of Jones's vehicle, but explained the government did not intend to call him as a trial witness. The motion disclosed to the court that Hayes's personnel file contained incriminating information, including more than seventy inmate complaints about him, and that he was under investigation for smuggling drugs into another prison. The court granted the government's motion and the information concerning Hayes was not produced to defense counsel. Also pretrial, the court denied Bruce's motion in limine to exclude all testimony concerning Jones's identification of Bruce.

The government's trial witnesses included Jones, who told the jury he was testifying in the hope that he would not be charged, and Robert Rush, an Atwater inmate who described himself as Bruce's friend. Rush testified that he helped Bruce orchestrate the smuggling scheme, that Bruce smuggled contraband into the prison, and that Rush sold it to other inmates and split the proceeds with Bruce. Rush also testified that Atwater guards pressured him to testify against Bruce.

The government's other witnesses included a Western Union representative who linked money transfers from Rush's friends and family to Bruce, and established that Bruce collected at least some of the money transfers using his California driver's license. A T-Mobile representative

testified that someone purchased a prepaid cell phone within the same time frame as the investigation into the smuggling ring and within the same geographic market as Atwater. The witness explained that this type of phone did not require verification of the purchaser's full name, Social Security number, or address. Federal agents linked calls and texts from the cell phone to associates of various inmates and to Jones. Officers from Atwater corroborated Jones's account of the events on the day he and his wife were stopped at the checkpoint, and described the investigation that followed the checkpoint stop.

The defense trial theory focused on demonstrating reasonable doubt about Bruce's participation in the narcotics smuggling ring. Bruce chose to testify, and although he conceded he was financially involved with inmates, he claimed these financial ties were limited to sports betting. Bruce testified that he drove a black Jeep Cherokee—the same kind of car Jones described Officer Johnson driving—and admitted that he knowingly violated prison policy by having a financial relationship with Rush. Bruce also admitted that he passed messages to inmates from outside the prison, and that he received money from Rush's girlfriend. Bruce testified that he viewed this payment as a "kind gesture" from Rush for his assistance with Rush's sports gambling. Bruce denied any other wrongdoing. The jury convicted Bruce on all counts.

Shortly after Bruce's verdict, the government indicted Hayes for taking part in a drug smuggling scheme at Victorville, a different federal prison in California. Hayes had transferred to work at Victorville prison after participating in the investigation at Atwater. The indictment charged Hayes with similar crimes and revealed that the

investigation into Hayes's actions at Victorville began in July of 2018, approximately sixteen months after Bruce was indicted and seven months before Bruce's trial started. Bruce's defense team immediately investigated the charges against Hayes by conducting follow-up interviews at Atwater. This time, inmate Rush provided significantly more detail about the guards' efforts to get him to cooperate with their investigation and their efforts to persuade him to testify against Bruce.

Rush told the defense team that Hayes was part of a group of officers who threatened to keep Rush in segregated housing unless he testified at Bruce's trial. According to Rush, the same group threatened to arrest Rush's family and friends. Devonne Randolph, the inmate Jones and his wife intended to visit on the day they were stopped at the checkpoint, did not testify at Bruce's trial but Randolph told the defense team in a post-trial interview that rumors among inmates and staff suggested it was "common knowledge" that Hayes also smuggled drugs into Atwater while he was employed there. Randolph described correctional officers at Atwater using much more extreme measures to persuade him to give information about "whatever cops was allegedly breaking the law"—including threatening to physically assault him if he did not cooperate with the investigation. But Randolph told the defense team that he had no personal interactions with anyone called Officer Johnson, and that he did not know David Bruce.

Bruce moved for a new trial based on *Brady v. Maryland*, 373 U.S. 83 (1963), arguing the government violated its obligation to produce exculpatory evidence. Bruce argued the government purposely failed to disclose that Hayes was a target in the Victorville investigation, and that many

inmates had lodged complaints against Hayes while he worked at Atwater. The government urged the court to deny the motion. It argued it had no obligation to produce the evidence concerning Hayes because Federal Rule of Evidence 608 would have prevented Bruce from using it for impeachment purposes. The government also argued the evidence of Hayes' misconduct did not negate the plethora of evidence against Bruce, and that the government had no reason to know the extent of Hayes's involvement in the Atwater investigation because the investigation reports contained little mention of Hayes. The district court agreed with the government. It ruled the previously undisclosed information did not undermine the court's confidence in Bruce's verdict, and denied the motion for a new trial. Bruce timely appealed.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court's orders admitting the identification evidence and denying Bruce's motion for new trial.

II.

We review de novo "[t]he constitutionality of pretrial identification procedures." *United States v. Carr*, 761 F.3d 1068, 1073 (9th Cir. 2014). We likewise review de novo the denial of a motion for a new trial arising from the government's duty to produce exculpatory evidence pursuant to *Brady*.[1] *United States v. Pelisamen*, 641 F.3d 399, 408 (9th Cir. 2011).

---

[1] We recognize there is some tension in our case law concerning the correct standard of review for these appeals. *See United States v. Endicott*, 803 F.2d 506, 514 (9th Cir. 1986). The outcome here does not depend on the standard of review.

III.

We first address Bruce's argument that the district court erred by allowing the government to admit evidence that Jones identified Bruce. In the district court, Bruce argued Jones's identification was unreliable because Jones identified Bruce under circumstances that were impermissibly suggestive. Specifically, after Jones described Officer Johnson wearing a Steelers' hat, he was shown a Facebook photo in which Bruce was the only one wearing a Steelers' hat, and he selected Bruce from the photo.[2] The district court was not convinced, and it denied the motion to exclude Jones's identification of Bruce. The court reasoned the circumstances in Bruce's case were unlike those in which witnesses testify after one brief exposure to a suspect during the commission of a crime or while witnessing a startling event. Rather than resting on a single, quick view, Jones was in close proximity to "Officer Johnson" on at least two prior occasions when the two met to pass contraband. The court determined Jones was capable of providing reliable testimony about whether Bruce was the person he met without being unduly influenced by the Facebook photo.

To review the constitutionality of a pretrial identification procedure, we consider whether the "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due

---

[2] Tracy Jones did not testify and the record is silent as to whether she accompanied Thomas to the meetings with Officer Johnson, or was otherwise able to identify him.

process . . . ."). Three factors guide our review: (1) whether "the pretrial identification procedure was impermissibly suggestive"; (2) whether "it was sufficiently reliable such that it does not implicate the defendant's due process rights"; and (3) "even if the pretrial identification procedure was suggestive and the identification was unreliable, this court [] examine[s] the district court's failure to exclude the identification for harmless error." *Carr*, 761 F.3d at 1074–75 (citing *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011)).

An identification procedure is suggestive when it focuses upon a single individual thereby increasing the likelihood of misidentification. *United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998). We examine the totality of the circumstances to determine whether an identification procedure was unduly suggestive. *United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985); *Neil*, 409 U.S. at 196. Among other factors, we have considered the witness's opportunity to view the person being identified, the witness's degree of attention, the accuracy of the witness's prior description, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the prior observation of the suspect and the confrontation. *Neil*, 409 U.S. at 199–200. "Any weaknesses in eyewitness identification testimony can ordinarily be revealed by counsel's careful cross-examination of the eyewitnesses." *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996).

Bruce argues that the use of the single Facebook photo violates longstanding precedent condemning identification techniques that focus attention on only one person. He argues such techniques are inherently suggestive and that the use of the Facebook photo was especially suggestive in this case because, according to Bruce, he and Hayes look alike: both

have Hawaiian and Caucasian ancestry and "nearly identical body styles." Bruce points out that Jones's trial testimony was inconsistent about whether he told the Atwater officers that Officer Johnson always wore a hat, and he argues that Jones must have guessed about Johnson's height because Johnson was sitting in his car both times Jones met with him.

Bruce is correct that Jones was uncertain in his trial testimony about whether he told the officers who stopped him that Officer Johnson always wore a hat. Jones was also unsure about whether he had said the hat was a Steelers hat. And Jones testified that Officer Johnson was about "five-four, five-five," only to later admit that he could not be sure of this detail because he had never seen Officer Johnson standing.[3] Bruce contends these inconsistencies in Jones's trial testimony show he was never sure of his identification and that the evidence of Jones's identification should have been excluded for this reason. We disagree.

We are persuaded the district court reasonably concluded the use of the Facebook photo was not so suggestive that it rendered Jones's identification unreliable. *See Neil*, 409 U.S. at 199–200. Unlike witnesses who are startled by a crime in progress, Jones ventured out to meet with "Officer Johnson" on two occasions and voluntarily got into his car both times. The two men were in close proximity and the second meeting took place just 15 days before Jones was stopped and questioned at the checkpoint. The Atwater officers testified that Jones identified Bruce from the photo without hesitation, and Jones testified that he was certain of the identification at the time he made it in 2015. Jones explained to the jury that before he was shown the Facebook photo, he accurately

---

[3] The record indicates Bruce is five-feet ten-inches tall.

described details concerning Officer Johnson's beard, hair color, body type, and clothing. Jones also recalled that Officer Johnson drove a black Jeep Cherokee.

More than three years passed between the day Jones identified Bruce from the Facebook photo and the day Jones testified at Bruce's trial. The jury was able to consider whether the passage of time may have accounted for the discrepancies between the identification Jones made in 2015 and the details he was able to recall at trial. The jury was also able to consider defense counsel's cross-examination of Jones and it heard the testimony of other witnesses who had been present during the interview following the checkpoint stop. *See United States v. Higginbotham*, 539 F.2d 17, 23 (9th Cir. 1976) (finding no prejudice resulted from admission of identification evidence because jury heard cross-examination of identifying witness). Certainly, the jury had reason to question Jones's credibility because it knew investigators suggested to Jones that he and his wife could avoid charges if Jones cooperated, and the jury knew Jones was eager to cooperate. Bruce contends that Jones's description of Johnson matched Hayes as well as Bruce, but he did little to develop or support this argument in the district court and the record does not allow us to meaningfully assess this comparison on appeal. Even if the Facebook photo was suggestive, our consideration of the totality of the circumstances persuades us that the district court did not err by admitting this identification evidence.

IV.

Bruce next argues the district court erred by denying his motion for a new trial because the government violated *Brady*

by failing to produce evidence of Hayes's misconduct.[4]  The government's pretrial motion sought an order permitting it to not disclose: (1) over seventy inmate complaints about Hayes, including some that alleged physical abuse; (2) that Hayes had been charged with domestic violence and was arrested for violating a protective order; (3) that two other investigations against Hayes were pending for physical abuse of inmates and for threatening inmates; and (4) that as of July 2018, Hayes was being investigated for smuggling contraband drugs into an unspecified prison, and had been observed meeting an inmate's girlfriend in a Home Depot parking lot and accepting a small package from her.  The motion disclosed that an inmate instructed his girlfriend to meet an orange SUV with "Vegas plates" in a parking lot and that the description of the vehicle matched one that Hayes owned. The motion acknowledged that Hayes had been present at the Atwater checkpoint in 2015 and helped search Jones's car, but it argued the information about Hayes's alleged malfeasance need not be disclosed because other witnesses could testify about the contraband found in Jones's car.[5] Under a heading titled "Expected Defense Arguments," the government's motion only stated that if the evidence regarding Hayes were disclosed to the defense, the defense might seek to call him for the sole purpose of bringing out impeachment evidence.  The government asserted that Evidence Rule 608 would not allow the evidence to be used

---

[4] Bruce also made passing mention of *Giglio v. United States*, 405 U.S. 150 (1972), and *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), but on appeal, he frames his claim as a *Brady* argument.

[5] On appeal, Bruce repeatedly asserts that Hayes found the contraband in Jones's car, but as the district court recognized, the record shows a different officer found the drugs.

in this way. The motion did not anticipate any other arguments the defense might raise regarding the discoverability of the withheld evidence.**[6]**

Bruce filed a motion for new trial after Hayes was indicted. The motion argued the government had been aware that Hayes was a target in the Victorville investigation and that it violated its duty to disclose this information. More specifically, Bruce charged the government "purposefully crafted" its case to avoid relying on Hayes so it could withhold evidence reinforcing Bruce's theory that a different culprit was responsible for smuggling contraband into Atwater. *See U.S. v. Bagley*, 473 U.S. 667, 676 (1985). Bruce cited post-trial interviews with inmates Rush and Randolph as proof that Hayes had been extensively involved in the Atwater investigation and contended the government's pre-trial motion left the district court in the dark by minimizing Hayes's involvement in the investigation into Bruce's smuggling. In response, the government conceded it had intentionally avoided calling Hayes as a witness because it knew Hayes was subject to being impeached, but the government maintained it had complied with *Brady*.

During the hearing on Bruce's motion for new trial, the district court took issue with the government's pre-trial

---

**[6]** *But see* DEP'T OF JUSTICE, POLICY REGARDING DISCLOSURE OF EXCULPATORY AND IMPEACHMENT INFORMATION: DISCLOSURE OF EXCULPATORY AND IMPEACHMENT INFORMATION BEYOND THAT WHICH IS CONSTITUTIONALLY AND LEGALLY REQUIRED, 9-5.001(C) (2020), https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#:~:text=Brady%20v.,material%20to%20guilt%20or%20punishment. (requiring disclosure of qualifying evidence without regard to admissibility). The same policy requires disclosure of qualifying evidence without regard to materiality. *Id.*

description of the role Hayes played in the Atwater investigation. The court described the government's pretrial motion as creating "the impression that . . . Hayes was just one of the officers who happened to be present at the . . . checkpoint," and observed that the government's pre-trial motion "le[ft] out any other involvement by Hayes" in the investigation. The court questioned why the government presented such sparse details in its pre-trial motion, and suggested that it might have "thought a little harder" about the motion had it known the full extent of Hayes's involvement. The government again conceded that "additional facts [] could have been provided" in the ex parte motion, but it argued the undisclosed information did not satisfy *Brady*'s materiality test because it did not negate any of the evidence against Bruce. The government stressed that it understood Hayes had played only a small role in developing the case against Bruce at the time it prepared its ex parte motion. The government also repeated its argument that Bruce would not have been able to introduce evidence of Hayes's misconduct.

The district court agreed with the government that there had been no *Brady* violation. The court ruled there was "overwhelming evidence that support[ed] the jury's verdict [against Bruce] completely and totally," and it pointed out that no witness had recanted his trial testimony, and that the post-trial interviews did not controvert any of the government's other evidence. The court found "nothing to support" Bruce's theory that Hayes was the real perpetrator at Atwater, and it denied Bruce's motion for new trial.

A.

In *Brady v. Maryland*, the Supreme Court held that prosecutors must disclose to the defense "evidence favorable to an accused . . . [that] is material either to guilt or to punishment" prior to trial. 373 U.S. at 87. This duty extends "irrespective of the good faith or bad faith of the prosecution." *Id.* We have explained that failing to disclose material, favorable evidence violates due process because it compromises the integrity of the defendant's trial. *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986). For this reason, "[t]he prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused, and even an inadvertent failure to disclose may constitute a violation." *Bailey v. Rae*, 339 F.3d 1107, 1113 (9th Cir. 2003) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

The second part of the *Brady* test—that the non-disclosed evidence be "material"—limits *Brady's* reach. *See id.* ("To be sure, not every violation of the duty to disclose constitutes a *Brady* violation."). "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

To succeed on his *Brady* claim, Bruce was required to show: (1) the evidence at issue was favorable to him, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently;

and (3) that he was prejudiced. *Shelton v. Marshall*, 796 F.3d 1075, 1083 (9th Cir.) (quoting *Strickler*, 527 U.S. at 281–82) *amended on reh'g*, 806 F.3d 1011 (9th Cir. 2015). Because there is no doubt the government did not disclose the challenged evidence, we consider only whether it was exculpatory and material.

## B.

Bruce identifies two categories of undisclosed information from the government's motion in limine that he contends are exculpatory: (1) evidence that Hayes was a target of an investigation into a very similar smuggling ring at Victorville; and (2) evidence showing that numerous inmate complaints had been made against Hayes prior to the Bruce investigation. Somewhat more obliquely, Bruce suggests the government should have disclosed that Hayes pressured some inmates to offer evidence against Bruce.

Exculpatory evidence includes evidence that is favorable to the defense, meaning "evidence that tends to prove the innocence of the defendant." *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014); *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) (observing that *Brady* requires the government disclose "material, exculpatory, or otherwise helpful" evidence). "Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (citing *Strickler*, 527 U.S. at 290); *see also United States v. Bundy*, 968 F.3d 1019, 1038–39 (9th Cir. 2020) (citing *Kyles*, 514 U.S. at 437) (evidence showing tactical units surrounding property where defendants were engaged in standoff with federal officers, and evidence showing government surveillance of the property, was exculpatory because it

rebutted government's theory that defendants did not fear government snipers). "To say that evidence is 'exculpatory' does not mean that it benefits the defense in every regard or that the evidence will result in the defendant's acquittal." *Bailey*, 339 F.3d at 1115. Rather, "exculpatory" connotes a broader category of evidence that, "if disclosed and used effectively, [] may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676; *see Bailey*, 339 F.3d at 1115 (granting new trial where government failed to disclose reports casting doubt on star witness's testimony, and rejecting argument that certain passages "somehow negate[d] the documents' exculpatory nature").

The obligations imposed by *Brady* are not limited to evidence prosecutors are aware of, or have in their possession. Rather, individual prosecutors have "the duty to learn of any favorable evidence known to others acting on the government's behalf" as part of their "responsibility to gauge the likely net effect of all such evidence" to the case at hand. *Kyles*, 514 U.S. at 437.

Here, the government argues the withheld evidence concerning Hayes was not exculpatory because it "was not material to Bruce's guilt or innocence" and did not negate the other evidence against Bruce. This conflates *Brady*'s exculpatory and materiality requirements.[7] *Bagley*, 473 U.S. at 676. On appeal, the government suggests the evidence would not have been admissible pursuant to Rule of Evidence

---

[7] The government cites *United States v. Agurs*, 427 U.S. 97 (1976) in support of its argument. *Agurs* addresses materiality, not the standard for determining whether evidence is exculpatory, and the three materiality standards articulated in *Agurs* have since been overruled. *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986).

401 or Rule 403, but this argument also misses the mark. The standard for relevance is easily met because evidence that one of Bruce's co-workers was accused of engaging in a very similar prison smuggling ring makes it somewhat more probable that a third party was responsible for the crimes Bruce was accused of committing. Fed. R. Evid. 401. The government did not raise a Rule 403 objection in the trial court, thereby forfeiting that issue.

In the trial court and on appeal, the government's response failed to acknowledge its broader ethical responsibility. *See Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (observing "government's interest in a criminal prosecution is not that it shall win a case, but that justice shall be done"); *see also Kyles*, 514 U.S. at 437–40 (recognizing "the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable" and for that reason, "a prosecutor anxious about tacking too close to the wind" will err on the side of disclosure in order to "justify trust in the prosecutor" and to "preserve the criminal trial . . . as the chosen forum for ascertaining the truth about criminal accusations"); *see also id.* (observing the ABA Standards for Criminal Justice "call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate").

Bruce persuasively argues that evidence of Hayes's smuggling at Victorville was exculpatory because it supported the defense theory that a third party was responsible for the crimes he was accused of committing. *See United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007); *Kyles*, 514 U.S. at 421 (observing that *Brady* "turns on the cumulative effect of all such evidence suppressed"). He argues this is particularly so if the evidence that Hayes was a

target in the Victorville investigation is viewed in conjunction with the other withheld evidence concerning Hayes.

The government strenuously argues it was entitled to structure its case to avoid producing evidence that could have been used to impeach Hayes and that it was free to do so because it had no obligation to call Hayes as a witness. But the fact the government took the step of filing an ex parte motion seeking the court's permission not to disclose evidence of Hayes's misconduct undercuts the suggestion that the government had no reason to question whether the undisclosed evidence was exculpatory. *See Kyles*, 514 U.S. at 439 (explaining the prudent prosecutor's better course is to take care to disclose any evidence favorable to the defendant in order to comply with *Brady*). We agree the government had no obligation to call Hayes as a witness, but the government still bore the burden of investigating whether potentially exculpatory evidence existed. *See Browning v. Baker*, 875 F.3d 444, 459 (9th Cir. 2017) (quoting *Strickler*, 527 U.S. at 280) (emphasizing prosecution's special status in criminal justice system heightens its burden of disclosure).

The government separately argues it cannot be held responsible for disclosing the extent of Hayes's involvement in the Atwater investigation because the government had no way of knowing that Hayes had contact with Atwater inmates who witnessed or participated in the Atwater scheme. Our case law also forecloses this argument. "Because prosecutors are in a 'unique position to obtain information known to other agents of the government,'" they have an obligation to "disclose what they do not know but could have learned." *Cano*, 934 F.3d at 1023 (alterations omitted). Prosecutors cannot turn a blind eye to their discovery obligations.

We are not persuaded by the government's separate contention that because Hayes and Rush were identified in the documents the government did produce, it was incumbent upon the defense to investigate Hayes and Rush and uncover potentially favorable evidence itself. This argument overlooks that Bruce's counsel had no reason to suspect that further discovery into Hayes's participation in the Atwater investigation could have yielded information supporting the defense theory. *Kyles*, 514 U.S. at 437.

Our conclusion that the government fell short of meeting its *Brady* discovery obligation here is influenced by the ex parte motion the government filed before trial. In it, the government memorialized its awareness that Hayes was present when Jones's vehicle was stopped and that Hayes was under investigation for introducing contraband into another federal prison in a very similar smuggling operation. Hayes was observed meeting an inmate's girlfriend in a Home Depot parking lot and accepting a small package from her. The motion also disclosed to the court that the government possessed an email exchange in which the inmate instructed his girlfriend to meet an SUV matching the description of Hayes's SUV. In short, by the time the government filed its motion seeking permission to withhold evidence of Hayes's alleged misconduct, it knew Hayes was suspected of running a prison smuggling ring using the same method Bruce was accused of using at Atwater. In addition, the government was undoubtedly aware that Hayes held a supervisory position at Atwater while Bruce's investigation was ongoing, and the government knew that its main trial witness, Rush, had been moved to segregated housing and questioned by prison officials. Whether memorialized in an investigation report or not, the government was certainly in a position to know Hayes was one of the officers who questioned Rush. Indeed,

Rush volunteered in his trial testimony that Hayes was one of the officers who moved him to segregated housing and threatened to keep him there if Rush did not testify against Bruce. Despite the stark similarities between the Atwater scheme and what was known about the smuggling at Victorville, the record does not show, and the government does not argue, that it ever followed up to learn what role Hayes played in the Atwater investigation, nor that the government took any steps to determine whether the two smuggling rings were in fact unrelated.[8]

The government's pretrial submission to the district court limited its "Expected Defense Arguments" to a one-sentence assertion that if the evidence were produced, the defense might seek to call Hayes for the sole purpose of bringing out impeachment information. Neither the ex parte motion nor the transcript of the argument held on Bruce's motion for new trial show the government ever took any steps to verify that the two smuggling rings were separate. Nor does the government argue on appeal that it considered whether exculpatory material might exist. The government collapses *Brady*'s three-part test into an examination of materiality.

The district court was not persuaded the withheld evidence was exculpatory, largely because Hayes was

---

[8] Post-trial, Randolph suggested it was "common knowledge" Hayes was involved in smuggling at Atwater. But the record on appeal does not show whether Randolph ever admitted to having personal knowledge about any smuggling. Nevertheless, contrary to the government's suggestion, it is plain the government knew the Victorville operation was remarkably similar to the one at Atwater and the government could have learned that Hayes played a role in the Atwater investigation that went beyond the checkpoint stop and included having contact with inmates who were accused or admitted to participating in the scheme.

accused of smuggling after Bruce's smuggling had been uncovered and because Hayes was accused of smuggling at Victorville rather than Atwater. Respectfully, we disagree. The responsibility imposed by *Brady* includes looking beyond evidence in the prosecutor's file; there were striking similarities between the two smuggling operations; Hayes was directly involved in the Atwater investigation that led to Bruce's arrest and had access to some of the witnesses who testified against Bruce; and Bruce's trial theory argued someone else was responsible for the smuggling at Atwater. Under the facts presented, we conclude this evidence was exculpatory within the meaning of *Brady* and at the very least the government was required to investigate it.

## C.

We evaluate the trial as a whole to determine whether the "admission of the suppressed evidence would have created a reasonable probability of a different result." *United States v. Price*, 566 F.3d 900, 911 (9th Cir. 2009) (internal quotation marks omitted). "In considering whether the failure to disclose exculpatory evidence undermines confidence in the outcome, judges must undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Jernigan*, 492 F.3d at 1054 (internal quotation marks omitted); *see Comstock v. Humphries*, 786 F.3d 701, 711–12 (9th Cir. 2015) (reversing conviction where lack of direct evidence combined with suppression of a witness's "expressed doubts and recollections" "substantially diminished, if not defeated" the state's ability to prove guilt beyond a reasonable doubt). Evidence is sometimes considered material if the government's other evidence at trial is circumstantial, or if defense counsel is able

to point out significant gaps in the government's case through cross-examination, or if witnesses provided inconsistent and inaccurate testimony. *See Bailey*, 339 F.3d at 1115–16 (granting new trial where suppressed report went "to the heart of [the accused's] defense and without it" the verdict was not "worthy of confidence").

Our decisions in *Jernigan* and *Price* are instructive. In *Jernigan*, we remanded for a new trial because the government did not disclose the existence of another bank robber for whom the defendant "may well have been mistaken." 492 F.3d at 1055. When considered with other inconsistencies in witness testimony and the lack of direct evidence against Jernigan, the omitted evidence suggested the defendant may have been innocent. In *Price*, our court remanded for a new trial because the prosecution failed to disclose its star witness's past convictions, which could have been used to undermine his credibility. The government's only direct evidence of Price's guilt came from this witness's testimony and in its closing argument, the government urged that the witness had no reason to lie. We explained that this created a "central weakness" for the defense. 566 F.3d at 913–14. Coupled with Price's showing that the government's other evidence was circumstantial and inconsistent, we concluded the undisclosed information was material. *Id.*

Bruce argues the information the government failed to disclose was material because it would have allowed the jury to find reasonable doubt about whether Hayes was responsible for the smuggling operation at Atwater. He contends there is a substantial likelihood the verdict would have been different if the jury had heard that Hayes was suspected of smuggling at Victorville and knew that, as a supervisor at Atwater, Hayes had access to the witnesses who

testified against him. Bruce also suggests the investigation reports suspiciously failed to document Hayes's involvement in the Atwater investigation, and maintains this fact could have been used to buttress his defense theory that there was reasonable doubt about his guilt. *See Kyles*, 514 U.S. at 420 (holding the State's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense).

Our task is to compare the evidence against Bruce with the gaps in the evidence presented to the jury to determine whether the undisclosed evidence undermines our confidence in the outcome. *See Price*, 566 F.3d at 911. We conclude it does not. First, though the jury did not have all the details, it was aware that Rush was pressured to testify against Bruce. Rush told the jury as much, volunteering that Hayes was one of the officers who moved Rush into segregated housing and threatened to keep him there if he did not testify. Rush also testified that he felt additional pressure because officials interviewed his girlfriend and his relatives during their investigation. The jury was not left with conflicting testimony about the prison officials' efforts to uncover the extent of the smuggling ring. The investigators corroborated Rush's account that he was moved to segregated housing, and they testified that another inmate expressed that investigators threatened his mother and brother during follow-up questioning.

The evidence against Bruce was substantial and we agree with the district court that in their post-trial interviews neither Jones nor Rush recanted their testimony about Bruce's involvement. By the district court's account, Rush "very credibly claimed" at trial that he and Bruce were friends, which was why Rush resisted cooperating with investigators.

The district court described Rush as demonstrating "no joy in testifying against Mr. Bruce," and observed that Jones was "quite, quite credible," and that his testimony had been "devastating" to Bruce. Considerable circumstantial evidence also implicated Bruce. Atwater investigators described Jones's account of the checkpoint stop and that Bruce showed up, at the appointed time, for the meeting Jones arranged after he agreed to cooperate. Representatives from Western Union and T-Mobile linked Bruce to monetary transactions from Atwater inmates' friends and family members, and also linked Bruce to the cell phone used to communicate with Jones.

Bruce testified that his financial dealings with inmates showed only that he engaged in sports gambling with them, but the jury was not required to credit this testimony. Bruce did not deny that he had accepted money from inmates, or that the cell phone was used to arrange meetings to pass the contraband. Unlike *Price*, the government's case did not bank on a single star witness; Rush and Jones corroborated each other's accounts and their testimony was heavily corroborated by other evidence. 566 F.3d at 913–14; *see, e.g.*, *Comstock*, 786 F.3d at 711–12; *Bailey*, 339 F.3d at 1115–16. The weight and force of the evidence against Bruce sets this case apart from others in which we have found *Brady*'s materiality element satisfied.

Though Bruce suggests the withheld evidence would have opened the door for the jury to hear that Hayes was smuggling drugs into Atwater, he offers no real evidence that Hayes did smuggle contraband into Atwater. Bruce's speculation that Hayes may have been left alone with Jones or his wife fares no better. He implies that Hayes may have had an opportunity to influence their statements, but the

investigating officers' testimony suggests several investigators were present when Jones and his wife were questioned.

Because we view the trial as a whole, our confidence in the verdict is not undermined by the government's failure to disclose that Hayes was a subject of an investigation at Victorville, that numerous inmates had complained about him, and the extent of his involvement in the Bruce investigation. The district court did not err by denying Bruce's motion for a new trial.

**AFFIRMED**.