FILED

AUG 16 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GREGORY P. BURLESON,

Defendant-Appellant.

No.   17-10319

D.C. No.
2:16-cr-00046-GMN-PAL-16
District of Nevada,
Las Vegas

ORDER

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GREGORY P. BURLESON,

Defendant-Appellant.

No.   21-10183

D.C. No.
2:16-cr-00046-GMN-NJK-16

Before:  CLIFTON, BENNETT, and DESAI, Circuit Judges.

The Memorandum Disposition filed on May 24, 2023 is amended by

replacing the sentence <The jury acquitted Burleson (and his codefendants) on two

conspiracy charges> in the last sentence of the penultimate paragraph on page 5

with <The jury did not reach a verdict on Counts 1 and 2 of the indictment>, and

by inserting the following new footnote immediately thereafter:

> Count 1 was charged as Conspiracy to Commit an Offense
> Against the United States, in violation of 18 U.S.C. § 371.

Count 2 was charged as Conspiracy to Impede or Injure a Federal Officer, in violation of 18 U.S.C. § 372.

An Amended Memorandum Disposition reflecting these amendments is being filed concurrently with this Order. With those amendments, the panel has unanimously voted to deny Appellant's petition for rehearing and rehearing en banc. Judges Bennett and Desai vote to deny the petition for rehearing and rehearing en banc, and Judge Clifton so recommends. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. *See* FED. R. APP. P. 35(f).

Accordingly, the petition for rehearing and rehearing en banc (Docket Entry No. 127) is DENIED. No further petitions for rehearing may be filed.

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff-Appellee, v. GREGORY P. BURLESON, Defendant-Appellant. | No. 17-10319 D.C. No. 2:16-cr-00046-GMN-PAL-16 AMENDED MEMORANDUM[*] |
| UNITED STATES OF AMERICA, Plaintiff-Appellee, v. GREGORY P. BURLESON, Defendant-Appellant. | No. 21-10183 D.C. No. 2:16-cr-00046-GMN-NJK-16 |

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, District Judge, Presiding

Argued and Submitted March 7, 2023
Las Vegas, Nevada

Before: CLIFTON, BENNETT, and DESAI, Circuit Judges.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

This appeal arises out of Gregory Burleson's participation in the 2014 armed standoff between agents of the Bureau of Land Management (BLM), and Cliven Bundy and his supporters in Bunkerville, Nevada.

Burleson was convicted in a jury trial of assaulting a federal officer, threatening a federal law enforcement officer, obstruction of justice, interference with interstate commerce by extortion, interstate travel in aid of extortion, and three counts of using and carrying a firearm in relation to a crime of violence. The district court at first sentenced him to 819 months imprisonment but later reduced that term to 387 months, influenced by a change in the sentencing law.

Burleson raises four grounds on appeal. He argues that: (1) the district court erred in denying his motion for a new trial, (2) the district court erred by declining to give a self-defense/defense-of-others instruction to the jury, (3) that the evidence was insufficient to support his convictions, and (4) that his sentence was substantively unreasonable. Because none of his contentions have merit, we affirm the judgment of the district court.

## I.    Background

### A.    *Factual history*

Cliven Bundy is a cattle rancher who lives near Bunkerville, Nevada.[1] For

---

[1] This court's opinion in *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) provides a useful overview of the facts regarding the standoff.

decades, Bundy and his family grazed their cattle on federal lands surrounding his property. *United States v. Bundy*, 968 F.3d 1019, 1023 (9th Cir. 2020). Bundy refused to obtain required grazing permits and ignored several federal district court orders over the years to pay grazing fees and fines and to remove his cattle from federal lands. *Id*.

In July 2013, BLM obtained a court order to "seize and remove to impound any of Bundy's cattle for any future trespasses." *Id*. (citation omitted). In early 2014, BLM began preparations for "Operation Gold Butte Impound" which entailed using contractors to round up the cattle trespassing on federal land and selling them at auction. *Id*.

The operation began in April 2014. On April 6, Dave Bundy, one of Bundy's sons, blocked a BLM convoy and was arrested. *Id*. at 1024. The Bundys launched a social media campaign calling for people to travel to Bunkerville and prevent BLM from carrying out the court order. "Hundreds of Bundy supporters, many heavily armed, poured into the area." *Id*.

Burleson was among these supporters. He drove from his home in Phoenix, Arizona to Bunkerville, arriving on April 12. He brought with him an AK-47, an AR-15, a shotgun, two sidearms, and more than 5,000 rounds of ammunition.

By this point, BLM had seized roughly 400 animals and was holding them at an impoundment site. *Bundy*, 968 F.3d at 1024. Bundy and his supporters,

17-10319

estimated to be more than 200 people, assembled to reclaim the cattle. *Id.* The group moved to the impoundment site and "took up threatening and tactically advantageous positions, pointing guns at BLM officers." *Id*. Outnumbered and outgunned, the federal agents then decided to evacuate the impoundment site and "left the cattle for the Bundys to reclaim." *Id*.

In the months following the standoff, the FBI investigated the events surrounding that day. Among other things, the FBI created a fictitious film production company to gather evidence under the guise of producing a documentary film about the standoff. The FBI interviewed Burleson and he described his involvement at the standoff. As described below, some of his statements were presented as evidence at his trial.

In January 2015, Burleson called and left a message for FBI Special Agent Michael Caputo, for whom he had worked as a paid informant. Agent Caputo returned Burleson's call and recorded their conversation. Burleson described his involvement in the standoff and made a series of incriminating statements that were also admitted as evidence at his trial.

*B. Procedural history*

In March 2016, a federal grand jury returned an indictment against nineteen defendants for several federal crimes stemming from the standoff. The district court divided the defendants into three tiers for trial. Burleson was placed in Tier 3,

the group of defendants that the government viewed as the "least culpable." The district court scheduled the trial of the Tier 3 defendants to go first, to be followed by trials of defendants in Tier 1 and Tier 2. *Bundy*, 968 F.3d at 1024.

Burleson was found guilty by the jury on eight counts: assault on a federal officer, threatening a federal law enforcement officer, obstruction of justice, interference with interstate commerce by extortion, interstate travel in aid of extortion, and three counts of use and carry of a firearm in relation to a crime of violence. The jury did not reach a verdict on Counts 1 and 2 of the indictment.[2]

The trial of the Tier 1 defendants, those identified as most involved, including Cliven Bundy and two of his sons, began several months later. *Bundy*, 968 F.3d at 1025. While the trial was underway, "the government began disclosing information in its possession that, under *Brady v. Maryland*, 373 U.S. 83 (1963), "was arguably useful to the defense and should have been produced to the defendants well before trial." *Bundy*, 968 F.3d at 1023. The district court determined that "the *Brady* violations were so egregious and prejudicial that the indictment needed to be dismissed with prejudice." *Id.* at 1029. Ultimately, charges were dismissed against all defendants identified in Tiers 1 and 2.

---

[2] Count 1 was charged as Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371. Count 2 was charged as Conspiracy to Impede or Injure a Federal Officer, in violation of 18 U.S.C. § 372.

Burleson filed a motion for a new trial in January 2019. He argued that the government violated its obligation under *Brady* to produce exculpatory evidence just as it did for the Tier 1 defendants. Burleson also argued that he was entitled to a new trial on the basis of newly discovered evidence, two emails written by a former BLM Special Agent detailing alleged misconduct he uncovered as part of BLM's internal investigation of the April 2014 standoff.

The district court denied the motion for a new trial, concluding that Burleson failed to make the required showing that the alleged *Brady* material was favorable to him and material to his case. The district court also concluded that the newly discovered evidence was similarly not material and did not entitle Burleson to relief.

## II.     Discussion

### A.     Motion for new trial

Burleson argues that the district court erred in denying his motion for new trial because the government withheld material, exculpatory evidence from the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*, prosecutors must disclose to the defense "evidence favorable to an accused . . . [that] is material either to guilt or to punishment" prior to trial. *Id.* at 87. We review de novo. *United States v. Bruce*, 984 F.3d 884, 890 (9th Cir. 2021).

To succeed on a new trial motion based on a *Brady* claim, Burleson must show: "(1) the evidence at issue was favorable to him, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) that he was prejudiced." *Id.* at 894–95.

Burleson argued that the withheld evidence was favorable to him because it would have supported a self-defense/defense-of-others theory at trial and provided "a non-criminal explanation" as to why he crossed state lines.

The affirmative defense of self-defense/defense of others is available "in a narrow range of circumstances" against a federal law enforcement officer who uses excessive force. *See United States v. Acosta-Sierra*, 690 F.3d 1111, 1126 (9th Cir. 2012). To prevail, Burleson must show that the withheld material was either exculpatory, which here means that it would tend to show that the federal law enforcement officers used excessive force, or impeaching, meaning that it would undermine or call into question the government's evidence that federal agents had not used excessive force.

Having reviewed the withheld evidence, we are satisfied that none of it contains any indication that federal officers used excessive force that would justify a self-defense/defense-of-others theory. Thus, the evidence was not material under *Brady* because it was not "exculpatory or impeaching." *Bruce*, 984 F.3d at 894.

17-10319

The district court did not err in denying the motion for a new trial based on the withholding of the challenged material.

Burleson also argues that the district court erred in denying his motion for a new trial based on newly discovered evidence. This evidence consisted of two lengthy emails written by a former BLM Special Agent detailing alleged misconduct he uncovered as part of BLM's internal investigation of the April 2014 confrontation. We review the denial of a motion for a new trial based on newly discovered evidence under an abuse of discretion standard. *United States v. Brugnara*, 856 F.3d 1198, 1206 (9th Cir. 2017). This involves a two-step analysis: first, we must determine whether the district court identified the correct legal standard; second, we must determine whether the district court's application of that rule was illogical, implausible, or unsupported by the record. *Id*.

Burleson does not dispute that the district court identified the correct legal standard as stated in *United States v. Waggoner*, 339 F.3d 915, 919 (9th Cir. 2003):

> A defendant who seeks a new trial based on new or newly discovered evidence must show that (1) the evidence is newly discovered; (2) the failure to discover the evidence is not attributable to a lack of diligence by the defendant; (3) the evidence is material to the issues at trial; (4) the evidence is neither cumulative nor impeaching; and (5) the evidence indicates that a new trial would probably result in an acquittal.

Applying the *Waggoner* factors, the district court concluded that the emails were not material "because they discuss alleged incidents of misconduct unrelated

to [Burleson's] personal involvement in the April 12, 2014, confrontation," and that "besides bald accusations, the [emails] provide no evidence that excessive force was used by BLM officers on April 12, 2014." The district court also determined that "the extensive evidence stacked against [Burleson] does not indicate that a new trial would likely result in an acquittal."

The district court identified the correct legal rule, and its application was not illogical, implausible, or unsupported by the evidence. The court did not abuse its discretion.

## B. Jury instructions

Burleson next argues that the district court erred by declining to give a self-defense/defense-of-others jury instruction. "A criminal defendant has a constitutional right to have the jury instructed according to his theory of the case," *United States v. Johnson*, 459 F.3d 990, 993 (9th Cir. 2006), provided that the requested instruction "is supported by law and has some foundation in the evidence," *United States v. Bello-Bahena*, 411 F.3d 1083, 1088 (9th Cir. 2005) (quoting *United States v. Fejes*, 232 F.3d 696, 702 (9th Cir. 2000)). We review de novo whether an instruction is supported by law. *United States v. Castagana*, 604 F.3d 1160, 1163 n.2 (9th Cir. 2010). Whether an instruction "has some foundation in the evidence" is reviewed for an abuse of discretion. *Bello-Bahena*, 411 F.3d at 1089 (quoting *Fejes*, 232 F.3d at 702).

The affirmative defense of self-defense/defense of others is available against a federal law enforcement officer "who uses excessive force in a narrow range of circumstances." *Acosta-Sierra*, 690 F.3d at 1126. A defendant must show "(1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances." *Id*. (quoting *United States v. Urena*, 659 F.3d 903, 907 (9th Cir. 2011)).

The district court concluded that Burleson was not entitled to the instruction because "the record belie[d] the defendants' contention that the agents used excessive force" and noted that the defendants did not "clearly state their argument for how the agents used excessive force." Instead, the court held, the defendants appeared to be arguing that the federal agents' "militarization of Bunkerville; their war-like garb; their weapons; and primarily their raising of guns at the individuals" at the site sufficed to establish excessive force. The court concluded that "no reasonable jury could conclude that the agents' actions constituted excessive force." The court also found that the defendants could not show that their actions were objectively reasonable.

We are satisfied that the district court properly denied the requested instruction was because it was not "supported by the law," and the district court did

not abuse its discretion by finding it did not have "some foundation in the evidence." *Bello-Bahena*, 411 F.3d at 1088–89 (quoting *Fejes*, 232 F.3d at 702).

### C.    *Sufficiency of the evidence*

Burleson next argues that the evidence was insufficient to support all of his convictions. As for his incriminating statements to the FBI, Burleson maintains that the other evidence at trial contradicted what he argued were his "extreme, inflammatory—and inherently unbelievable—alcohol fueled statements." He contends that he was merely present at the standoff for 90 minutes and carrying a legal firearm pointed at the ground. Relatedly, Burleson argues that his convictions cannot stand under the *corpus delicti* doctrine,[3] which requires that a conviction must rest on more than an uncorroborated confession.

In reviewing the sufficiency of the evidence, this court determines "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

---

[3] We apply a two-part test to determine whether the government met its burden under the *corpus delicti* doctrine: first, the government must "introduce sufficient evidence to establish that the criminal conduct at the core of the offense has occurred"; and second, "it must introduce independent evidence tending to establish the trustworthiness of the admissions, unless the confession is, by virtue of special circumstances, inherently reliable." *United States v. Lopez-Alvarez*, 970 F.2d 583, 592 (9th Cir. 1992).

reasonable doubt." *United States v. Hong*, 938 F.3d 1040, 1047 (9th Cir. 2019) (internal quotation marks and citation omitted).

Viewed in the light most favorable to the prosecution, the pertinent evidence at trial was as follows. Burleson stated that he travelled to Bunkerville and brought "half the weapons in [his] arsenal" including an AK-47, an AR-15, a shotgun, two sidearms, and a thousand rounds of ammunition for each weapon, as well as body armor. Burleson stated that he went there "for the purpose of engaging rogue federal agents that were breaking the law." When Burleson arrived in Bunkerville, he heard that "the situation had escalated" and that "the BLM is pointing their weapons at the unarmed protestors." Burleson then told "everybody that [he] could see" to "mount up, gear up, it's go time, weapons, body armor, let's go." He added, "I literally went there to put them six feet under, I was hell bent on killing federal agents," and "I went down there fully expecting to die."

Burleson said he organized people with weapons "to box these guys in" and that they successfully managed to do so. He added that he "got into my position," "sighted in the people that I was targeting," "I know where I'm gonna shoot; I know where it's gonna go," and that he was "at low-ready the whole time."

Burleson also said he told the federal agents to "cease and desist now or suffer consequences that you won't survive" and that "I know a couple of them heard it because they were looking at me and pointing at me." Burleson said they

waited until the federal agents left "before we gave our positions up." He added that he was disappointed that the confrontation was not "bloody" because "I really wanted to take them out . . . because they are federal employees . . . they have taken an oath to defend and protect the Constitution of the United States, which they broke in a big way."

Burleson also reveled in the agents' withdrawal from the site: "They knew that they would have died, why do you think they backed off? They were outnumbered, they were out-positioned, they were boxed in, the only way that they had to go out was backwards away from everybody else" and in doing so "they had to give up their positions so we could go and retrieve Mr. Bundy's cattle for him."

Burleson did not testify at trial, but his incriminating statements were consistent with, and corroborated by, video and photographic evidence as well as the testimony of FBI Special Agent Joel Willis. This evidence shows that Burleson was present at the cattle impoundment site with an "AR-style rifle" and was taking up positions conveying he was ready to engage the BLM agents guarding the site. This evidence also shows that he was not merely holding a weapon "pointed at the ground" while walking around. For example, the government introduced a photograph showing Burleson crouching down and holding his rifle in a ready to shoot position, consistent with his inculpatory statements.

17-10319

Several agents also testified to their fear and belief that they would have been shot during the confrontation—showing that Burleson's actions did not go unperceived. One agent testified, "I was pretty certain at some point in this situation I was probably going to get shot" and that he was "possibly going to die that day." Another agent testified that he feared for his safety, and that "parts of [his] body would shake uncontrollably."

We are satisfied that the evidence was sufficient such that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hong*, 938 F.3d at 1047 (internal quotation marks and citation omitted). Burleson's argument on appeal that he was "intemperate[ly] boasting," calls for a credibility determination that is the province of the jury. *See United States v. Magallon-Jimenez*, 219 F.3d 1109, 1114 (9th Cir. 2000). The jury was well positioned to assess his credibility in the government's videos, and Burleson offers no persuasive argument to the contrary. Burleson's *corpus delicti* argument is also unpersuasive. The government established that the "criminal conduct at the core of the offense has occurred" and introduced "independent evidence tending to establish the trustworthiness of [Burleson's] admissions." *Lopez-Alvarez*, 970 F.2d at 592.

*D.     Sentence*

Burleson argues that his 387-month sentence is substantively unreasonable. In 2017, the district court sentenced him to 819 months. At the time, a defendant's first conviction for brandishing a firearm during a crime of violence came with a mandatory minimum sentence of 7 years, and a mandatory minimum sentence of 25 years "in the case of a second or subsequent" conviction, all of which were to run consecutively. *See* 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(C)–(D) (2017). Accordingly, 684 months of Burleson's original 819-month sentence was because of the three firearm convictions. In 2021, Burleson moved for a sentence reduction, citing the First Step Act of 2018 which amended § 924(c) such that the 25-year mandatory minimum would no longer apply to multiple 924(c) convictions obtained in a single prosecution. Noting that Burleson would receive a much lower sentence had he been sentenced after the First Step Act, the district court reduced his sentence by "unstacking" and reducing his sentences for his second and third 924(c) convictions.

We review the reasonableness of a sentence "under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007). As for the non-firearm offenses, the record shows that the district court imposed a reasonable sentence consistent with the goals of 18 U.S.C. § 3553(a)(2). The court declined to take three applicable upward departures relating to the offenses. The district court also reached the adjusted guidelines range of 135 to 168 months by a downward

departure of ten levels from a base offense level of 42 considering Burleson's "vulnerability, physical impairment, alcoholism, and past cooperation." In imposing the 135-month sentence for the non-firearm offenses, the district court highlighted the seriousness of the conduct and the resulting effect on federal law enforcement officers who were seeking to enforce a court order.

We recognize that Burleson, identified prior to trial as within the group of defendants who appeared least involved in the episode, is now the only person incarcerated as the result of the April 2014 standoff. That does not make his sentence substantively unreasonable, however. We conclude that the district court did not abuse its discretion.

**AFFIRMED.**